[Cite as *In re E.G.*, 2014-Ohio-2007.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| IN THE MATTER OF: | : | |
| E.G., JR. | : | CASE NO. CA2013-12-224 |
| | : | O P I N I O N<br>5/12/2014 |
| | : | |
| | : | |

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. JN2011-0403

Carol A. Garner-Stark, 9435 Waterstone Blvd., Suite 140, Cincinnati, Ohio 45249, guardian ad litem

Amy R. Ashcraft, 240 East State Street, Trenton, Ohio 45067, for appellant, E.G.

Michael T. Gmoser, Butler County Prosecuting Attorney, Michael A. Oster, Jr., Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for appellee, Butler County Children Services

**PIPER, J.**

{¶ 1} Appellant, the biological father of E. G., appeals a decision of the Butler County Court of Common Pleas, Juvenile Division, granting permanent custody of the child to a children services agency.

{¶ 2} The Children Services Division of the Butler County Department of Job and

Family Services received a referral regarding E.G. in January 2011. The agency investigated the complaint and determined that the child's mother was abusing drugs and engaging in prostitution in the home. The agency began providing services for the family, including working with the mother on her substance abuse issues. On September 9, 2011, the mother contacted the agency asking if someone could pick up E.G. from the bus stop, indicating to the agency that she was unable to care for the child. The agency contacted the father, who stated that he was unable to pick up E.G., he was not sure when he would be home, and he did not know of any other friends or relatives who could care for the child.

{¶ 3} E.G. was taken into the agency's custody and a complaint alleging the child was neglected and dependent was filed. The trial court found that the child was neglected and dependent on February 6, 2012. The agency continued to work with the mother and father. The mother engaged in some services initially, but eventually surrendered her parental rights to the child. The father made little progress on the case plan adopted by the court and the agency filed for permanent custody of the child on December 4, 2012.

{¶ 4} After a hearing on the permanent custody motion, the magistrate determined that permanent custody of the child should be granted to the agency. The father's objections to the decision were overruled by the trial court.

{¶ 5} The father now appeals the trial court's decision to grant permanent custody of E.G. to the agency and raises two assignments of error for our review. Both assignments of error allege that the trial court erred in granting permanent custody to the agency. Specifically, father argues that the trial court erred in determining that permanent custody was in E.G.'s best interest and that the decision is not supported by the evidence.

{¶ 6} Before a natural parent's constitutionally protected liberty interest in the care and custody of his child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met.

*Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388 (1982). An appellate court's review of a juvenile court's decision granting permanent custody is limited to whether sufficient credible evidence exists to support the juvenile court's determination. *In re Starkey,* 150 Ohio App.3d 612, 2002-Ohio-6892, ¶ 16 (7th Dist.). A reviewing court will reverse a finding by the juvenile court that the evidence was clear and convincing only if there is a sufficient conflict in the evidence presented. *In re Rodgers* (2000), 138 Ohio App.3d 510, 520 (12th Dist.).

{¶ 7} Pursuant to R.C. 2151.414(B)(1), a court may terminate parental rights and award permanent custody to a children services agency if it makes findings pursuant to a two-part test. First, the court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors of R.C. 2151.414(D). Second, the court must find that any of the following apply: the child is abandoned; the child is orphaned; the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; or where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. R.C. 2151.414(B)(1)(a), (b), (c) and (d); *In re E.B.,* 12th Dist. Warren Nos. CA2009-10-139, CA2009-11-146, 2010-Ohio-1122, ¶ 22.

{¶ 8} The juvenile court found by clear and convincing evidence, and father does not dispute, that E.G. has been in the temporary custody of the agency for more than 12 months of a consecutive 22-month period. However, father does dispute the juvenile court's finding that granting permanent custody of E.G. to the agency is in the child's best interest.

{¶ 9} R.C. 2151.414(D)(1) provides that in considering the best interest of a child in a permanent custody hearing:

> [T]he court shall consider all relevant factors, including, but not limited to the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child."

{¶ 10} At the hearing, the caseworker testified that the agency had been providing in-home services to E.G. and his mother for about eight months prior to the child's removal from the home. The caseworker indicated that there was "some success and some missteps" during this time and that following residential drug treatment, the mother had relapsed several times. On the day the agency took custody of E.G., the worker received a text message from the mother asking her to pick up E.G. from the bus stop because the mother stated she "was in trouble with my life." The worker called father, who indicated the mother had called him about picking up the child, but he was unable to do so. In addition, father did not know when he would be home, and could not provide any alternative options regarding where the agency could take the child.

{¶ 11} After E.G's removal, the agency investigated other possible placements for the child. Father suggested a friend or neighbor he thought might help by taking custody of the child, but the friend/neighbor did not answer despite several calls, and did not return agency messages. Later in the case, father suggested the child could be placed with father's brother

in Georgia. The agency requested a home study for possible placement, but as of the date of the permanent custody hearing, the completed home study had not been received.

{¶ 12} The caseworker testified that case plan services for father included completion of a substance abuse assessment and to follow all recommendations. The case plan also required father to complete random drug screens and to maintain safe and appropriate housing. She stated that father completed the substance abuse assessment and treatment was recommended. He was referred to the Community Behavioral Health for substance abuse treatment, but was discharged after continued drug use. The drug and alcohol therapist treating father at Community Behavioral Health testified at the hearing that father was discharged from the program for testing positive on his drug tests. The drug and alcohol therapist indicated that she recommended outpatient group therapy, but father told her he did not have a problem and was not coming back.

{¶ 13} Father was then referred to The Next Right Thing for substance abuse treatment, but was eventually discharged from the center due to continued drug use. Drug screens taken during father's treatment were positive for alcohol and cocaine and the caseworker testified that father has not successfully completed this case plan requirement. Residential treatment was recommended after father's second discharge from treatment, but father has not completed this requirement. The caseworker testified that father was on a waiting list for the residential treatment program, and when a spot was available, he was contacted at four different numbers, but did not report for treatment.

{¶ 14} The caseworker also testified that father completed the basic core parenting program for the Development of Living Skills program, but the educators did not feel it would be beneficial to do the extended curriculum due to father's continuing substance abuse problems. The agency requested that father attend the Celebrating Families parenting program, but father refused the program for several months, and when he finally agreed to

go, the program was no longer available. The caseworker testified that father's home did not have any safety hazards, but the agency had some concern because of problems with people breaking into the home.

{¶ 15} On removal, E.G. was placed in temporary care for one day. E.G. has autism and is placed in a therapeutic foster home on the second day. He has remained in the same therapeutic foster home since that time, and the caseworker indicated the child has made considerable progress. According to the caseworker, on removal from his mother's home, E.G. had "little to no speech," was aggressive in the home, constantly moving, throwing cars, moving furniture and was "all over the place." The child now uses both verbal and nonverbal communication and talks in sentences. He has calmed down substantially and the caseworker indicated E.G. doesn't run around or act aggressively or any of the other behaviors she observed before removal.

{¶ 16} A foster parent also testified at the hearing and indicated that the family has adopted two children with autism and both parents have taken classes and training on dealing with autism. The foster parent indicated that the child was scared and shy at first, but is now more social and is bonded with the family and extended family. When he first arrived, E.G. had anger issues and meltdowns, but his behavior has improved and the foster parent works with the child every day in the areas that need improvement. The foster parent indicated that E.G. goes to speech therapy and had just enrolled in a program for the summer where he will work on social skills and other behaviors to help his transition into the next school year. The foster parent indicated that the family would definitely like to adopt E.G., and that if this happened, they would encourage him to see his biological family. The foster parent stated that the family's two adopted sons still see their biological families.

{¶ 17} The caseworker indicated that father has been consistent in visiting the child throughout the case. Visits took place at the agency's visitation center except for a time

where the agency tried unsupervised visits in father's home. The unsupervised visits were discontinued after father's drug tests were positive and E.G. displayed behavior problems in the car on the way to the visits. The foster parent indicated that when E.G. realized they were on a certain road that would lead to his father's house, E.G. began acting crazy, crying and screaming, and even threw a toy car, breaking the front windshield.

{¶ 18} E.G.'s biological mother testified at the hearing that she has been pleased with the improvement in E.G. while he has been in the foster home and she wants him to stay there. She testified that she would be concerned if E.G. were placed with his father because she questioned whether the therapy and attention that the foster parents were giving the child would continue. The mother indicated that she took care of E.G. because father could not control the child's behavior and was mean to him. The mother testified that father has always used alcohol during the time of their relationship and that she believes he is a drug dealer.

{¶ 19} Father testified at the hearing that he is paid in cash and "works for Jose" and Jose works for another company. He stated that he does not have problems with alcohol and could quit any time. He admitted that drug tests were positive for cocaine, but that he has never used cocaine. He stated tests were positive because he has friends who use cocaine and it "penetrates." Father admitted that he has never had custody of the child. He indicated that he works from 8:00 a.m. to 7:00 p.m. and if he had custody of E.G., a friend would watch the child if he was working. However, he admitted that he has not discussed this possibility with the friend yet. Father stated that he would need to move to a larger home if he had custody of the child and admitted that his home was broken into and computers, cameras and $10,000 in cash were stolen. He stated that he does not drive, but would have friends help transport E.G. to the services he requires for his special needs.

{¶ 20} As mentioned above, on appeal, father argues that the trial court erred in determining that permanent custody was in E.G.'s best interest and that the court's decision

is not supported by the evidence. In its decision, the trial court addressed the statutory best interest factors found in R.C. 2151.414(D).

{¶ 21} With respect to R.C. 2151.414 (D)(1)(a), the juvenile court found that E.G.'s mother was his primary caregiver and that father has never provided day-to-day care for the child. The court also found that father maintained regular visitation with the child and that for a short time he had unsupervised visits in his home, but due to changes in E.G.'s behavior surrounding the visits and father's positive drug tests, visitation was moved back to the agency. The court also found that the child has been in therapeutic foster care, with parents trained to deal with the child's autism and special needs. The court found the children and foster parents are all bonded with E.G., as is the extended family. Finally, the court indicated that the foster parents would like to adopt E.G. and that they have expressed a willingness to maintain contact with the child's biological family.

{¶ 22} With respect to R.C. 2151.414(D)(1)(b), the juvenile court indicated that the guardian ad litem prepared a report and recommended that permanent custody of E.G. be granted to the agency.

{¶ 23} With respect to R.C. 2151.414(D)(1)(c), the juvenile court found that E.G. has been in the temporary custody of the agency since his removal on September 9, 2011. The court found that the child has been in the agency's custody for more than twelve months of a consecutive 22-month period before the permanent custody motion was filed.

{¶ 24} In considering R.C. 2151.414 (D)(1)(d), the juvenile court found that E.G. is in need of a legally secure placement. The court found that E.G. was four years old when he was removed from his home, and on the first day of the permanent custody hearing was almost six years old. The court reviewed the mother's failure to complete the case plan and noted that she signed a permanent surrender of the child. The court reviewed father's failure to complete the case plan requirements. The court noted father's failure to complete

substance abuse treatment, and frequent drug-testing that was positive for cocaine and/or alcohol. The court reviewed an assessment of father's progress which indicated father was unsuccessful in two programs and continued to deny and minimize his substance abuse problem. The court also found that father admitted his current residence was not appropriate for the child and that he would have to find a larger and safer apartment.

{¶ 25} The court also reviewed the case plan requirements for E.G. and found that the foster parents have demonstrated a commitment to the child and have followed through on all services that were recommended and the child has made progress in all areas. The court concluded that neither the mother nor father were capable of providing a safe, stable and drug-free environment for the child. With regard to father, the court found that he continues to deny his substance abuse problems and demonstrated a lack of understanding about the child's special needs due to E.G.'s autism. The court concluded it was not in the child's best interest to be placed with either his mother or father, and that no other family member is available to take custody of the child.

{¶ 26} Based on consideration of the statutory factors, the trial court determined by clear and convincing evidence that it was in E.G.'s best interest to grant permanent custody to the agency. After careful review, we find the trial court's decision is supported by the evidence. E.G.'s mother surrendered custody and was not an option for placement. There was no evidence of family members or friends who were appropriate placements for the child.

{¶ 27} Further, the evidence supports the trial court's determination that E.G. cannot be placed with his father. Father has never had custody of the child and has not established that he can care for E.G.'s autism and special needs. Father failed to complete substance abuse treatment twice, and according to his providers, continues to deny that he has a substance abuse problem. He has not established that he is able to provide a safe home

and to address the child's autism and special needs.

**{¶ 28}** Accordingly, we find no error in the trial court's determination that it was in E.G.'s best interest to grant permanent custody to the agency and we find that the trial court's decision was supported by the evidence. Father's assignments of error are overruled.

**{¶ 29}** Judgment affirmed.

HENDRICKSON, P.J., and M. POWELL, J., concur.