[Cite as *In re L.W.*, 2017-Ohio-8433.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

IN THE MATTER OF: L.W., et al.

:

:

:

:

:

CASE NOS. CA2017-05-066
CA2017-05-067
CA2017-05-068
CA2017-05-069

O P I N I O N
11/6/2017

APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case Nos. 15-D000046, 15-D000047, 15-D000048, 15-D000049

Kim Bui, 8080 Beckett Center Drive, Suite 112, West Chester, Ohio 45069, for appellant

David P. Fornshell, Warren County Prosecuting Attorney, Kirsten A. Brandt, 520 Justice Drive, Lebanon, Ohio 45036, for appellee, Warren County Children Services

Matthew N. Miller, 306 South Third Street, Hamilton, Ohio 45011, for appellee, CASA

**S. POWELL, J.**

{¶ 1} Mother appeals a decision of the Warren County Court of Common Pleas, Juvenile Division, granting permanent custody of L.W.1, L.W.2, L.W.3, and L.W.4 (referred to collectively as the "children") to appellee, Warren County Children Services ("WCCS").[1]

---

1. We note the four children share the same initials; therefore, for ease of discussion we refer to the children numerically, in order by birthdates. Thus, we refer to the oldest child born in November 2007, as "L.W.1," the second oldest child born in October 2008, as "L.W.2," the third oldest child born in May 2010, as "L.W.3," and the youngest child born in November 2011, as "L.W.4."

{¶ 2} On May 26, 2015, WCCS filed a complaint alleging neglect and dependency. The complaint alleged a referral informed WCCS that Mother was using heroin, the home did not contain sufficient food for the children because Mother sold her food stamps to support her drug use, and Mother locked the children in bedrooms throughout the day. Thereafter, WCCS made contact with Mother, confirmed the lack of food in the home, and that Mother had a balance of $3 on her food stamp card. Additionally, Mother agreed to a drug test and tested positive for heroin and morphine. Mother admitted to using such drugs with her "live-in boyfriend," as well as the occasional use of other prescription medication without a prescription.

{¶ 3} On the same date as the filing of the complaint, the juvenile court conducted an emergency shelter care hearing and placed the children in the temporary custody of WCCS. On August 6, 2015, the juvenile court held an adjudicatory hearing and found the children dependent and neglected. On August 18, 2015, the juvenile court held a dispositional hearing and ordered that the children remain in the temporary custody of WCCS. The juvenile court appointed a representative for the Court Appointed Special Advocate ("CASA"). Neither Mother nor Father appeared for the hearings. WCCS developed a case plan with the goal of reunification of the children with the parents. The original case plan included completing drug and alcohol and mental health assessments and following any recommendations therefrom, abstaining from using illegal drugs and submitting random drug screens, signing any requested releases, obtaining stable housing and employment, avoiding unnecessary encounters with law enforcement, attending visits, and remaining compliant with WCCS.

{¶ 4} On May 16, 2016, WCCS moved for a six-month extension of temporary custody. On October 27 and November 22, 2016, WCCS and Mother filed motions requesting an additional six-month extension, respectively. On December 21, 2016, the

CASA representative objected to the extension motions and moved for a grant of permanent custody of the children to WCCS. On January 24, 2017, WCCS joined the CASA representative's motion for permanent custody. The juvenile court heard testimony for the motion on April 3, 2017. The testimony revealed the following facts.

{¶ 5} WCCS and Mother had prior interaction before the commencement of the present case, as a juvenile court granted WCCS protective supervision of the children in December 2011. Shortly thereafter, the juvenile court placed the children in the temporary custody of WCCS due to Mother's illegal drug use, physical abuse of the children, and domestic violence incidents between Mother and Father. Mother successfully worked through her case plan and the juvenile court returned custody of the children to Mother with WCCS continuing to have protective supervision. The case closed in January 2013.

{¶ 6} WCCS assigned the first caseworker to Mother's present case from May 2015 to January 2016. The first caseworker testified regarding initial ongoing concerns with Mother's extensive illegal drug use, the presence of her live-in boyfriend around the children, a lack of food at the home, and reports Mother locked the children in bedrooms throughout the day. Originally, WCCS placed the children together in the same foster home. However, due to behavioral issues their individual placements changed multiple times. WCCS moved L.W.2 and L.W.3 to a new foster home due to sexualized behavior towards L.W.1. The sexualized behavior, including digital penetration between L.W.2 and L.W.3, continued in their new placement; therefore, WCCS returned L.W.3 to his original placement with L.W.1 and L.W.4.

{¶ 7} The caseworker testified regarding additional concerns with Mother's live-in boyfriend. These concerns included his extensive criminal history as well as L.W.1 informing the caseworker the boyfriend made her lie in bed naked with him on multiple occasions in addition to allegations of physical abuse. WCCS moved L.W.1, L.W.3, and L.W.4 to a

second foster home because concerns regarding the original foster parents' fitness for placement arose. The children's behavioral issues continued throughout the pendency of the case, but have largely subsided over time while placed with their respective foster families. The children have participated in counseling and have begun to advance in school after starting behind other students academically at the beginning of this case.

{¶ 8} WCCS later amended the original case plan to remove Father because his whereabouts became unknown. With respect to Mother and the case plan, she did not begin working towards meeting the plan's objectives until November 2015. Mother attended a detox program, transitioned to drug and alcohol intensive outpatient care, but failed to complete the aftercare phase of the program. Despite efforts by WCCS, Mother did not have any contact with WCCS from May to November 2015. During this initial meeting with Mother in November 2015, Mother tested negative in her drug screen, but indicated to the caseworker that she used heroin a couple days earlier. Upon resurfacing, Mother expressed willingness to attempt to meet the objectives of her case plan. The caseworker and Mother discussed the allegations regarding Mother's live-in boyfriend and that he would have to participate in the case plan for reunification. Mother expressed disbelief with respect to the allegations of abuse and a concern the live-in boyfriend would not cooperate with WCCS. The first caseworker opined that Mother did not substantially remedy the conditions, which caused the children's removal.

{¶ 9} The second caseworker took over Mother's case in February 2016. The second caseworker testified the children are progressing in their respective foster homes and have bonded with their foster parents. The second caseworker corroborated the first caseworker's testimony regarding Mother's participation in a detox program as well as drug and alcohol intensive outpatient care. In March 2016, Mother transitioned to the aftercare phase of the program where she was receiving Vivitrol shots to help prevent relapse with

heroin. In September 2016, the second caseworker completed an unannounced home visit where Mother submitted a drug screen positive for amphetamines and methamphetamines. Upon further discussion, Mother revealed that she used methamphetamine once with her live-in boyfriend and his friends. Due to the positive drug screen, the second caseworker recommended Mother complete a new drug and alcohol assessment. Mother did not complete this assessment until late November 2016.

{¶ 10} In addition to Mother's relapse, the second caseworker discussed Mother's inconsistent attendance for individual and group therapy sessions and her failure to show up for a few of her monthly Vivitrol shots. This inconsistent attendance prompted Mother's counselor to send Mother a letter in February 2016 informing her of possible dismissal from the program if her attendance did not improve. The second caseworker expressed concern that Mother had failed to complete her drug and alcohol objective in her case plan by the time of the permanent custody hearing. With respect to her other case plan objectives, Mother completed parenting classes and obtained stable housing and employment. However, the housing only had three bedrooms; therefore, concerns remained regarding the children sharing rooms, as they had to be separated from one another throughout the case. Further, Mother's live-in boyfriend remained a significant concern.

{¶ 11} The second caseworker indicated to Mother her concerns regarding the children's allegations of abuse by the live-in boyfriend. Mother indicated to the second caseworker that she did not believe the allegations and that she does not believe it is a concern. In October 2016, the second caseworker's supervisor sent Mother a letter informing her that WCCS could not recommend reunification if the live-in boyfriend remained in contact with Mother. Despite indicating to the caseworker on multiple occasions that she would end her relationship with the live-in boyfriend, Mother did not end the relationship until two weeks before the permanent custody hearing. The second caseworker testified regarding her

- 5 -

doubts the relationship has ended with finality. In the months between receiving the letter and ending the relationship, Mother and the live-in boyfriend were seen together on multiple occasions, including showing up to visitation together. Mother's therapist testified that Mother's disbelief regarding the allegations of abuse by her live-in boyfriend indicates to her that Mother needed additional treatment to address the relationship as an ongoing concern.

{¶ 12} Both caseworkers indicated that Mother inconsistently attended visitation. The juvenile court placed the children in the temporary custody of WCCS in May 2015. Mother attended one visit in June 2015. Thereafter, Mother did not have any contact or communication with the children until February 2016. Mother explained she had been depressed and using heroin during this time. Mother reengaged with visitation upon entering treatment, which lasted until the visitation was ultimately suspended. The caseworkers described the visits as chaotic and noted Mother's inability to engage with all four children at the same time.

{¶ 13} On April 11, 2017, the juvenile court granted permanent custody of the children to WCCS. The present appeal followed.

{¶ 14} Assignment of Error No. 1:

{¶ 15} THE TRIAL COURT ERRED BY NOT APPOINTING COUNSEL TO REPRESENT THE CHILDREN, WHO ARE ALSO PARTIES TO PERMANENT CUSTODY PROCEEDINGS.

{¶ 16} Mother contends the juvenile court committed plain error by not appointing separate counsel for the children. Mother argues the appointment of separate counsel would have helped to determine the best interest of the children. Further, the juvenile court's error prejudiced her because the appointment of separate counsel would have resolved possible conflicts between the wishes expressed by the children and the opinions shared by the CASA representative.

{¶ 17} Generally, when an attorney is appointed to protect the interest of a child, as in the case here with the appointment of the CASA representative, "that attorney may also act as counsel for the child, absent a conflict of interest."[2] *In re Holt*, 10th Dist. Franklin No. 03AP-355, 2003-Ohio-5580, ¶ 20. Thus, because a representative may maintain dual roles, "a court is not required to appoint separate counsel unless [a representative's] recommendations regarding their best interest conflict with the children's wishes." *In re J.M.*, 12th Dist. Warren No. CA2008-12-148, 2009-Ohio-4824, ¶ 52, citing *In re Williams*, 101 Ohio St.3d 398, 2004-Ohio-1500, ¶ 27; *see also* Juv.R. 4(C); R.C. 2151.281(H). To determine whether such conflict exists, juvenile courts should make a case-by-case determination of whether a child needs independent counsel, which involves consideration of the maturity of the child. *In re B.K.*, 12th Dist. Butler No. CA2010-12-324, 2011-Ohio-4470, ¶ 19. The appointment of independent counsel may be necessary when the child has consistently and repeatedly expressed a strong desire that differs and is otherwise inconsistent with the representative's recommendations. *Id.*

{¶ 18} Mother did not object to the juvenile court's decision to not appoint separate counsel; therefore, our review of her assignment of error is limited to plain error. *In re Lay*, 12th Dist. Butler No. CA97-06-115, 1998 Ohio App. LEXIS 2007, *4 (May 4, 1998). Plain error review is not favored in civil cases and is defined in such context as an error that "seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Goldfuss v. Davidson*, 79 Ohio St.3d 116 (1997), syllabus. Appellate courts will only recognize plain error in extremely rare cases with exceptional circumstances. *In re E.J.*, 12th Dist. Warren No. CA2014-07-098, 2015-Ohio-731, ¶ 10.

{¶ 19} After a thorough review of the record, we find no error in the juvenile court's

---

2. We note the juvenile court appointed counsel to represent the CASA representative.

- 7 -

decision to not appoint separate counsel for the children, plain or otherwise. While the record does indicate some of the children considered living with Mother, the record does not support a finding the children consistently and repeatedly expressed a desire to live with Mother. The CASA representative testified that L.W.1 informed her that "she loves her mother very much but she's afraid if she goes back to her mother she'll end up back in foster care again." L.W.1 maintained her desire to be adopted by her foster family in her juvenile court interview and submitted a letter stating "[d]ear Judge[,] I want to get adopted by my family that I am with now. Please." Thus, L.W.1's wishes were consistent with the recommendation of the CASA representative.

{¶ 20} L.W.2 explained to the CASA representative he "loves his mother also, and would like to stay with his foster family that he's with right now * * *." However, L.W.2 indicated to the juvenile court that he wanted to live with Mother, "but doesn't want [the live-in boyfriend] to be around." L.W.2 again changed his position by stating, "[he] want[s] to see [his] mom sometimes." L.W.3 stated to the CASA representative "he wants to go back with [Mother]." When explaining his position to the juvenile court, L.W.3 stated he wanted to live with Mother because the live-in boyfriend was "in jail forever", but did not explain why he believed the live-in boyfriend was in jail.

{¶ 21} With respect to the wishes expressed by L.W.2 and L.W.3, the record does not support a finding the two children consistently and repeatedly expressed a desire to remain with Mother. Rather, the focus of their wishes centered on the absence of the live-in boyfriend. *See, e.g.*, *In re T.S.*, 2d Dist. Greene Nos. 2016-CA-26 and 2016-CA-28, 2017-Ohio-482, ¶ 39 (finding trial court did not err by not appointing separate counsel where children expressed a desire to live with foster parents, but also, once expressed a desire to live their mother so long as the "scary boyfriends" were gone).

{¶ 22} Additionally, the juvenile court had the opportunity to interview the children and

determined that at five years old, L.W.4 was too young to express her wishes. Furthermore, the juvenile court attributed little weight to the wishes of L.W.2 and L.W.3 because they were eight years old and six years old, respectively. The juvenile court found the three younger children were not mature enough to understand the situation and we defer to the juvenile court's factual determinations. Nonetheless, considering L.W.3's mistaken belief that the live-in boyfriend was in jail forever and L.W.2's indecisiveness, the record supports the juvenile court's finding with respect to the three younger children's maturity and understanding of the situation. The juvenile court found the only child that demonstrated the maturity to express her wishes was L.W.1, who indicated a desire for adoption by her foster family. While Mother does correctly assert that the age difference between L.W.1 and L.W.2 is only one year, the record clearly supports the juvenile court's finding L.W.1 possessed superior maturity to the other children. The caseworkers specifically testified regarding L.W.1's maturity, as demonstrated by her undertaking of a motherly role with her younger siblings.

{¶ 23} Based on the foregoing, the recommendation of the CASA representative does not conflict with the children's wishes. To the extent that any conflict exists, the particular children that created the conflict have not demonstrated consistently and repeatedly that their desire differs with the CASA recommendation. Rather, the focus of any conflicting wishes revolves around the removal of Mother's live-in boyfriend. As discussed further below, Mother only ended the alleged troublesome relationship two weeks before the permanent custody hearing and the caseworker testified regarding her doubt that it actually ended permanently. Considering the children's maturity and the lack of conflict between the CASA representative recommendation and the children's wishes, the record supports a finding the juvenile court did not commit plain error by not appointing separate counsel. While the children did indicate some indecisiveness in expressing their wishes to the CASA

representative and the juvenile court, viewing this fact in light of their young age, does not alone result in an error by the juvenile court that seriously affected the basic fairness, integrity, or public reputation of the judicial process.

{¶ 24} Accordingly, the trial court did not commit plain error and Mother's first assignment of error is overruled.

{¶ 25} Assignment of Error No. 2:

{¶ 26} THE TRIAL COURT'S DECISION AND ORDER GRANTING PERMANENT CUSTODY WAS NOT SUPPORTED BY SUFFICIENT, CREDIBLE EVIDENCE AND WAS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 27} Mother asserts the juvenile court erred by granting permanent custody of the children to WCCS because the record did not contain competent, credible evidence to support such grant. Thus, Mother argues reunification with her is in the best interest of the children. Mother contends the trial court's best interest determination was against the manifest weight of the evidence because the children are strongly bonded with her, she obtained housing and employment, ended her relationship with her live-in boyfriend, and made additional progress on her case plan.

{¶ 28} "The rights to conceive and to raise one's children have been deemed 'essential' * * *." *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208 (1972), quoting *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625 (1923). "Despite the fact that we have found that parents who are suitable have a paramount right to raise and care for their children, it is equally well settled that '[t]he fundamental interest of parents is not absolute.'" (Citations omitted.) *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 40. "The constitutional right to raise one's children does not include a right to abuse, exploit, or neglect them, nor is there a right to permit others to do so." *Id.* "The state's power to terminate parental rights is circumscribed * * *." *Id.* at ¶ 41, citing *In re Cunningham*, 59 Ohio St.2d 100, 105 (1979).

However, "when that authority is properly invoked, it is fully proper and constitutional to remove children from their parents' care. [S]uch an extreme disposition is nevertheless expressly sanctioned * * * when it is necessary for the 'welfare' of the child." *In re AsF(F)*, 12th Dist. Madison Nos. CA2016-05-020 and CA2016-05-021, 2016-Ohio-7836, ¶ 12, quoting R.C. 2151.01(A).

{¶ 29} The state must prove by clear and convincing evidence that the statutory standards for permanent custody have been met before a natural parent's right to custody can be terminated. *Santosky v. Kramer*, 455 U.S. 745, 769, 102 S.Ct. 1388 (1982); *In re E.G.*, 12th Dist. Butler No. CA2013-12-224, 2014-Ohio-2007, ¶ 6. "Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 477 (1954). This court's review of a juvenile court's decision granting permanent custody is limited to whether sufficient credible evidence exists to support the juvenile court's determination. *In re M.B.*, 12th Dist. Butler Nos. CA2014-06-130 and CA2014-06-131, 2014-Ohio-5009, ¶ 6. An appellate court will not reverse a finding by the juvenile court that the evidence was clear and convincing absent sufficient conflict in the evidence. *Id.*

{¶ 30} A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. When considering a manifest weight of the evidence challenge, the reviewing court weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts, the trial court clearly "lost its way" and created such a "manifest miscarriage of justice" that the judgment must be reversed and a new trial ordered. *In re S.M.* at ¶ 10.

{¶ 31} "Pursuant to R.C. 2151.414(B)(1), a court may terminate parental rights and award permanent custody to a children services agency if it makes findings pursuant to a two-part test." *In re T.P.*, 12th Dist. Clermont No. CA2016-03-012, 2016-Ohio-5780, ¶ 13. First, the court must find that the grant of permanent custody to the agency is in the best interest of the child. R.C. 2151.414(B)(1). In so doing, the court shall consider all relevant factors, including, but not limited to, the factors enumerated in R.C. 2151.414(D). Second, the court must find that any of the following apply: (1) the child is abandoned, (2) the child is orphaned, (3) the child has been in temporary custody of the agency for at least 12 months of a consecutive 22-month period, (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. R.C. 2151.414(B)(1)(a) thru (e); *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709, ¶ 10. To satisfy part two of the permanent custody test, only one of the above five findings need be met. *In re A.W.*, 12th Dist. Fayette No. CA2014-03-005, 2014-Ohio-3188, ¶ 12.

{¶ 32} R.C. 2151.414(D)(1) provides that in considering the best interest of a child in a permanent custody hearing:

> [T]he court shall consider all relevant factors, including, but not limited to, the following:
>
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child

- 12 -

has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d)  The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e)  Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 33} In granting permanent custody, the juvenile court considered each of the best interest factors in light of the evidence presented at the hearing.  With respect to the first statutory factor, the juvenile court found the children are placed in adoptable foster homes and doing well.  The children have bonded with their respective foster families and their only chance at stability is a grant of permanent custody to move forward with adoption proceedings.

{¶ 34} In consideration of the second statutory factor, the juvenile court considered the recommendation of the CASA representative in favor of granting permanent custody to WCCS.  As discussed above, the juvenile court also interviewed the individual children and L.W.1 provided a hand-written note to the juvenile court.  The note expressed L.W.1's desire to be adopted by her foster family.  L.W.2 explained that he "wants to live with Mother, but doesn't want [the live-in boyfriend] to be around," which L.W.2 later changed to "I want to see my mom sometimes."  L.W.3 indicated a desire to live with Mother because he unjustifiably thought the live-in boyfriend "[was] in jail forever."  The juvenile court found L.W.4 was too young to express her wishes.  As discussed above, the juvenile court gave different weight to the wishes of the children based on its perceived maturity level for each respective child. The juvenile court found that L.W.1 was the only child who demonstrated the maturity to make an informed decision regarding his or her wishes.  In so doing, the juvenile court noted L.W.1 was well spoken and able to support her decision to be adopted by her foster family.

{¶ 35} With respect to the third statutory factor, the juvenile court reviewed the children's custodial history and found the children were adjudicated dependent and neglected and had been in the temporary custody of WCCS for 12 or more months of a consecutive 22-month period.

{¶ 36} In considering the fourth statutory factor, the juvenile court found the children's need for a legally secure permanent placement cannot be achieved without a grant of permanent custody to WCCS. Specifically, the juvenile court found Mother is unable to meet the needs of the children and she has failed to remedy the conditions resulting in the children's removal. The juvenile court acknowledged Mother has made some progress in the approximately two years since removal; she continues to exercise poor judgment preventing reunification. The juvenile court identified her decision to place greater importance on her live-in boyfriend than reunification with the children for almost the entirety of this case. The juvenile court further found Mother is unable to be reunified with the children within a reasonable time. The juvenile court explained that adoption is the best chance for the children to achieve the stable family home they need.

{¶ 37} Based on these findings, the juvenile court found by clear and convincing evidence that it was in the children's best interest to grant permanent custody to WCCS. After thoroughly reviewing the record, we find the juvenile court's determination regarding the best interest of the children is supported by clear and convincing evidence and not against the manifest weight of the evidence. Though Mother has made efforts to meet the requirements of her respective case plan as well as has demonstrated a bond with the children, there are compelling reasons to weigh the best interest factors in favor of permanent custody to WCCS. Approximately four years prior to the filing of the present complaint, WCCS previously removed the children from Mother's care due to her illegal drug use, physical abuse of the children, and domestic violence incidents between Mother and

Father. Although Mother successfully worked through her case plan and the juvenile court returned custody of the children to Mother, many of the same issues later arose and caused the commencement of this case.

{¶ 38} Mother's continuous drug use and concerns of alleged abuse by Mother's live-in boyfriend plagued this case throughout much of its two years. While Mother contends she finally ended her relationship with the live-in boyfriend two weeks before the permanent custody hearing, competent, credible evidence presented at the hearing suggests her assertion strains credulity. Despite communication from the caseworkers on several occasions regarding their concerns with the presence of the live-in boyfriend around the children, Mother's relationship continued throughout the majority of the case. Upon learning of the children's allegations of sexual and physical abuse, Mother gave little recognition to the seriousness of such allegations and responded with disbelief. Moreover, after the juvenile court issued a no contact order for the live-in boyfriend with the children, the relationship continued and Mother even showed up to visitations with the live-in boyfriend, which resulted in the suspension of visitation.

{¶ 39} While Mother did attempt to obtain treatment for her issue with illegal drug use, these efforts were ultimately unsuccessful. At the beginning of the case, Mother completed a drug and alcohol assessment, successfully detoxed and attended the second stage of the program, but failed to complete the aftercare phase. Following this failure was an approximate six-month period of admitted drug abuse and a lack of communication with WCCS. Mother again demonstrated to WCCS willingness to work through her case plan, but little success resulted. Throughout the pendency of the case, the only case plan objective completed by Mother was parenting classes. Any steps forward by Mother were met with two steps back centered on the same conditions that caused the children's removal.

{¶ 40} Mother completed another detox program and attended drug and alcohol

intensive outpatient care, yet failed a second time to follow through with the final aftercare phase of the program. Likewise, relapse followed this failure, as Mother tested positive in September 2016 for amphetamines and methamphetamines. In addition to Mother's struggles to remain free of drugs, she inconsistently attended her individual and group therapy sessions, as well as failed on multiple occasions to show up for her monthly Vivitrol shots. Mother demonstrated the same inconsistency with attending visitation and did not have any contact with the children from when visitation was discontinued in June 2015 until February 2016. Mother justified this absence based on depression and her use of heroin.

{¶ 41} While we acknowledge Mother's attempts at sobriety, her completion of the parenting classes, and that she obtained housing and employment, we find there is clear and convincing evidence to support the juvenile court's grant of permanent custody. "It is important to have finality in custody determinations to protect the best interest of the child[ren]." *In re A.L.A.*, 11th Dist. Trumbull No. 2016-T-0022, 2016-Ohio-5887, ¶ 20. The children had been in the temporary custody of WCCS for approximately two years at the time of the juvenile court's grant of permanent custody. The children need to know whom they may rely upon for their care and nurture and are placed in foster-to-adopt families.

{¶ 42} Based upon the evidence in the record, one must be concerned whether Mother's problematic relationship will resume following the resolution of this case, considering her staunch unwillingness to end the relationship during the approximate two years she had to do so. *In re G.C.*, 12th Dist. Butler Nos. CA2016-12-237 thru CA2016-12-240, 2017-Ohio-4226, ¶ 45 (discussing concern parents' troublesome relationship will resume following resolution of custody determination). In the children's current placements, the children are progressing academically and behaviorally. The behavioral concerns that arose at the commencement of their temporary custody placements have mostly subsided. Although Mother has made some effort to work towards reunification, she has failed to

substantially remedy the conditions causing the children's removal. The juvenile court already provided an additional six months for Mother to demonstrate reunification is possible; however, in this period the same concerns remained. *See In re S.S.*, 2d Dist. Miami No. 2011-CA-07, 2011-Ohio-5697, ¶ 31-38 (holding a grant of permanent custody was in child's best interest where parent failed to make any progress in case plan and failed to become and remain drug free). The children deserve a stable environment that is not plagued by the risk of neglect and illegal drug use. Therefore, the juvenile court's determination regarding the best interest of the children is supported by clear and convincing evidence and not against the manifest weight of the evidence.

{¶ 43} Accordingly, Mother's second assignment of error is overruled.

{¶ 44} Judgment affirmed.

HENDRICKSON, P.J., and M. POWELL, J., concur.