[Cite as *In re J.M.E.*, 2018-Ohio-47.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY


IN THE MATTER OF: JACOB M.E.　　　:

　　　　　　　　　　　　　　　　:　　CASE NOS. CA2017-04-054
　　　　　　　　　　　　　　　　　　　　　　　　CA2017-07-113
　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　O P I N I O N
　　　　　　　　　　　　　　　　:　　1/8/2018
　　　　　　　　　　　　　　　　:


APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 15-D000010


David P. Fornshell, Warren County Prosecuting Attorney, Kirsten A. Brandt, 520 Justice Drive, Lebanon, Ohio 45036, for appellee

John C. Kaspar, 130 East Mulberry Street, Lebanon, Ohio 45036, for appellant


**HENDRICKSON, P.J.**

{¶ 1}　Appellant, the biological mother of Jacob M.E., appeals from a decision of the Warren County Court of Common Pleas, Juvenile Division, granting permanent custody of her son to appellee, Warren County Children Services ("WCCS" or "the agency"). For the reasons set forth below, we affirm the juvenile court's decision.

{¶ 2}　On February 17, 2015, WCCS filed a complaint alleging that Jacob (born June 3, 2010) was a dependent child. The complaint indicated that the agency had received a

report that Jacob's custodian, his biological father, had passed away earlier that month. Jacob was left in the care of his half-sister, who did not feel she could properly care for him long term and no other relatives were willing or able to care for him.

{¶ 3}   Although Jacob's biological mother, D.H. ("Mother") had supervised visitation with Jacob, WCCS did not feel Mother was a suitable placement for the child.  WCCS had an open case involving Mother and Jacob's older half-brother, R.M., who had been removed from Mother's care due to concerns of domestic violence.  Given Mother's past physical abuse of R.M. and her failure to complete case plan objectives in R.M.'s case, WCCS felt it was necessary to monitor the situation before permitting Mother to take custody of Jacob.

{¶ 4}   Following an emergency shelter care hearing held on February 17, 2015, Jacob was placed in WCCS's care.  Thereafter, on April 29, 2015, the juvenile court held an adjudicatory hearing and found Jacob to be a dependent child.  On May 15, 2015, following a dispositional hearing, Jacob was placed in the temporary custody of WCCS.  A Court-Appointed Special Advocate ("CASA") was assigned to the case.

{¶ 5}   WCCS added Jacob to Mother's already-existing case plan in R.M.'s case. The case plan objectives were for Mother to complete case management, medication management, parenting classes, a mental health assessment and a drug and alcohol assessment, to comply with any services recommended from said assessments, including mental health counseling, to submit to random drug screens, and to demonstrate stable housing and income.  The case plan also set forth certain behavior changes Mother needed to make before reunification with Jacob could occur.  Mother needed to refrain from behaviors of physical and verbal abuse, improve her communication abilities, and learn to resolve conflicts before they escalated to the point that police involvement was necessary.

{¶ 6}   Temporary custody was extended to WCCS in February 2016, and then again

- 2 -

in July 2016.  During this time, Mother completed parenting classes and demonstrated stable employment and housing.  However, Mother made limited progress in meeting the remaining goals of her case plan.

{¶ 7}    Mother completed her first drug and alcohol assessment in July 2014, as part of R.M.'s case plan, and there were no recommendations for treatment at this time as Mother had self-reported she was not using any drugs or alcohol.  However, after Mother tested positive for marijuana, she was reassessed in August 2015, and a standard outpatient treatment program ("SOP") was recommended.  The SOP program entailed 15 individual classes, a family meeting, and an exit interview.  Mother failed to complete the program.

{¶ 8}    In October 2015, a third assessment was completed and a SOP program was again recommended.  Mother failed to regularly attend the classes and was discharged unsuccessfully from treatment.  Finally, in April 2016, Mother had a fourth assessment and the same SOP program was recommended.  Mother completed the program in September 2016.

{¶ 9}    However, although Mother completed the SOP program, she continued to test positive for marijuana when randomly screened by the agency.  Mother tested positive for marijuana a number of times, including on May 25, 2016, July 1, 2016, November 28, 2016, and December 2, 2016.  Mother challenged the accuracy of the drug screens, suggesting that the results were false positives stemming from her use of the prescribed medication Protonix, from taking daily doses of Motrin, or from eating energy bars sold at Walmart that allegedly contained hemp.  Mother also accused the agency of falsifying or tampering with the drug-test results.  She began to excessively call the agency, sometimes more than 20 times a day, and became verbally abusive and threatening towards the agency's workers.  At one point, she accused a WCCS supervisor of lying about the drug-test results and told the

supervisor, "You set me up bitch…I'm coming for you."

{¶ 10} Mother also made limited progress with her mental health counseling. Mother engaged in a mental health assessment in January 2014, and attended some counseling sessions at Solutions Community Counseling and Recovery Center ("Solutions") before her initial treatment was terminated for non-attendance. Mother was reassessed in April 2016, and was diagnosed with depression, anxiety, and having active trauma symptoms.[1] One of Mother's treatment goals was to work on communicating effectively and managing stressors that caused her to become verbally aggressive. Mother began attending bi-weekly individual mental health counseling sessions at Solutions. However, she continued to have attendance issues, which made it more difficult to reach her treatment goals.

{¶ 11} Part of Mother's treatment at Solutions entailed helping Mother cope with the fact that she felt like she was being "revictimized by the system" and that WCCS was the perpetrator of the abuse.[2] Mother acknowledged to her counselor that she was often verbally aggressive in her interactions with WCCS workers and had limited success in implementing what she was learning in therapy to adjust her behavior. Mother's aggressive behavior towards the agency continued to worsen as time went on, and at one point Mother made the statement that "this is why people shoot people" in reference to dealing with WCCS at a court proceeding.

{¶ 12} As a result of Mother's behavior, Mother's case plan was amended in July 2016 to require a full psychological assessment. The juvenile court ordered the assessment, and Mother was evaluated by a psychologist at Solutions in September 2016. Mother was

---

1. Mother's mental health counselor explained that "with active trauma symptoms, we're referring to intrusive thinking. We're referring to a lot of anxiety or fear response. Um, we're referring to hypervigilance, hyper-alertness, [being] easily startled by things that frighten * * * and of memories harking back to prior abuses."

2. As a child, Mother was abused. She was removed from her home "by the system" at age 13 and placed in foster care.

diagnosed with a generalized anxiety disorder, major depression, a substance abuse disorder regarding her use of marijuana, and a personality disorder that led to attendant social complications and difficulty dealing with interpersonal interactions. The psychologist recommended Mother continue her individual mental health treatment and join group treatment for survivors of trauma.

{¶ 13} In addition to receiving treatment at Solutions, Mother also briefly participated in therapy sessions through the Bair Foundation, a foster care organization that does in-home counseling. Counseling was recommended for Jacob, his foster parents, and Mother as a result of Jacob's ADHD diagnosis. Mother attended two sessions in November 2016, one at WCCS's visitation center and the other at the agency's office. Jacob was present for both of these sessions.

{¶ 14} After Mother's visitation with Jacob was suspended in December 2016, Mother expressed a desire to continue sessions with the therapist from the Bair Foundation in order to obtain additional parenting education. The therapist agreed and three additional sessions with Mother were scheduled. Mother proceeded to cancel and reschedule the appointments several times, which ultimately led the Bair Foundation to terminate its services with Mother.

{¶ 15} Until her visitation was suspended in December 2016, Mother maintained frequent contact with Jacob. Initially, Mother had supervised visitation with Jacob once a week for two hours at WCCS's visitation center. Then in June 2015, visitation was expanded and became unsupervised. However, in May 2016, after Mother failed a random drug screen and began showing threatening and disconcerting behavior towards the agency's workers, Mother's visitation was restricted to supervised visitation. The agency indicated it would consider granting unsupervised visitation again if Mother had three consecutive negative drug screens.

{¶ 16} During the supervised visits, WCCS workers noticed a lack of bond between Mother and Jacob. Over Mother's objections, the case plan was amended to require Mother to complete a bonding assessment. The bonding assessment was scheduled to occur in November 2016, but Mother canceled the assessment and rescheduled it for January 2017. However, in December 2016, the agency moved to suspend Mother's visitation after Mother continued to test positive to marijuana, had inappropriate conversations with Jacob involving him "coming home" with her, made threats to take Jacob from the agency if she did not receive unsupervised visitation, and continued to verbally abuse and threaten agency workers. The juvenile court granted the motion, and Mother's ability to visit or have telephone contact with Jacob was suspended in December 2016.

{¶ 17} WCCS moved for permanent custody of Jacob on January 11, 2017, as a result of Mother's continued aggressive and erratic behavior and her limited progress in meeting the goals of the case plan. In its motion, WCCS stated that Jacob had been in its temporary custody for more than 12 months of a consecutive 22-month period, that Jacob should not or could not be placed in Mother's custody within a reasonable time period, and that permanent custody was in Jacob's best interest. A hearing on the motion was held on April 14, 2017. At this time, the juvenile court heard testimony from a WCCS supervisor who was involved in Jacob's case from February 2015 to July 2016, a WCCS ongoing caseworker who became involved in Jacob's case in July 2016, the in-home therapist from the Bair Foundation, the mental health counselor from Solutions, the psychologist from Solutions, Jacob's half-sister, Jacob's maternal grandmother, Mother, and Mother's former boss.

{¶ 18} The supervisor testified that prior to the agency opening a case on Jacob in February 2015, the agency was familiar with Mother through an open and on-going case involving Jacob's half-brother, R.M. The agency had been given custody of R.M. after abuse

allegations were substantiated. Mother had struck R.M. with a boom, which left marks and bruises on R.M. In August 2016, R.M. was placed in a Planned Permanent Living Arrangement.

{¶ 19} The supervisor explained that since Jacob was added to Mother's open case plan with the agency, Mother has met some of the case plan requirements. Mother has maintained stable housing and employment and completed two parenting class programs, one in March 2015 and one in June 2015. However, Mother's progress in meeting other case plan objectives has been limited. Particularly concerning to the supervisor was Mother's continued use of marijuana, her repeated refusal to acknowledge or admit she used the drug, and her behavior when confronted with the results of the random drug screens. Mother first claimed that the results were "false positives" caused by various medications she had taken or by consuming an energy bar. Mother then began to blame the agency for her positive test results, claiming that WCCS workers had falsified or tampered with the test results. Mother personally threatened the supervisor, stating, "You set me up bitch…I'm coming for you."

{¶ 20} The supervisor testified that during the pendency of the case, Mother became very aggressive and threatening towards WCCS workers. The supervisor stated that "if [Mother] was unhappy with decisions or discussions she had with caseworkers or anyone in our agency, she would become very threatening, name calling, calling our agency up to 25 times a day. Um, very abusive." The supervisor explained that she addressed Mother's behavior with her, but Mother told her she was not going to stop behaving that way as WCCS was "the enemy." Mother's abusive and erratic behavior caused the agency concern about how Mother would behave around Jacob. Mother's behavior was a consideration in the agency's decision to require supervised visitation and then, later, to suspend visitation altogether. Even after Mother had three clean drug screens, the agency did not reinstate

supervised visitation due to concerns about Mother's behavior and her failure to implement the skills she had learned during her parenting classes and counseling sessions.

{¶ 21} The caseworker also found Mother's behavior to be aggressive and threatening. She testified that "it was very difficult just to have a civil conversation with [Mother]." Mother began to record all conversations and interactions she had with the agency and she made statements that she was "going to take [Jacob] if she didn't get unsupervised visitation with him."

{¶ 22} The caseworker also testified about concerns the agency had about Mother's interactions with Jacob. Despite being told not to speak with Jacob about the progress of the case, Mother continued to make statements to Jacob about him "coming home" with her. There were also concerns about the lack of a bond between Mother and Jacob. The caseworker explained that phone calls between Mother and Jacob were short and Mother struggled to engage Jacob in conversation. As for in-person visits, a case aide who supervised Mother's visitation reported a lack of bond between Mother and the child. The caseworker was present for one of Mother's visitations with Jacob in August 2016, and observed this lack of bond, noting that there was very little interaction between Mother and Jacob. The agency amended Mother's case plan to include a bonding assessment, which Mother ultimately failed to complete.

{¶ 23} The caseworker explained that WCCS moved for permanent custody of Jacob due to the fact that it had the same concerns in January 2017 as it did when the case was first opened in February 2015. Mother lacked sufficient progress on her mental health and drug and alcohol objectives, she had not taken the bonding assessment, and her erratic and threatening behavior continued. The caseworker stated Mother had not "shown the agency that she [could] handle small stressors" or that her communication abilities had improved.

The caseworker reported that since WCCS filed for permanent custody, Mother had disengaged from services with the Bair Foundation and failed to take two scheduled drug tests.

{¶ 24} The caseworker also testified that Jacob has been in WCCS custody for more than 12 months out of a consecutive 22-month period, he is developmentally on track, and is in a licensed-to-adopt foster home. Jacob has bonded with his foster parents and two other children in his foster parents' care. The foster parents have expressed an interest to the agency in adopting Jacob if the opportunity presents itself.

{¶ 25} Jacob's foster mother testified at the hearing that Jacob was placed in her home on November 13, 2015, and he has bonded to her, her spouse, and to his two foster-siblings. Jacob refers to his foster mother as "Mom." She described Jacob as a very active and hyper child who has been diagnosed with ADHD. Jacob is currently in the first grade, and foster mother is working with Jacob's school to get him placed on an individualized education program.

{¶ 26} Jacob's foster mother also testified that Jacob had regular contact with Mother until Mother's visitation was suspended in December 2016. Mother and Jacob had nightly phone calls that usually lasted between 40 and 90 seconds. For the most part, Mother's phone conversations with Jacob were appropriate, but foster mother did intervene on a couple of occasions when Mother told Jacob that people were trying to keep her from seeing him or when she mentioned him "coming home" with her. As for Mother's in-person visitation with Jacob, foster mother reported that Jacob would be unusually quiet after the visits for about an hour. Foster mother reported that Jacob has not asked about Mother since her visitations were suspended.

{¶ 27} Mother's mental health counselor testified about Mother's on-going mental

health treatment at Solutions. The counselor explained that a large part of Mother's treatment at Solutions was geared towards helping Mother learn to communicate effectively, create good boundaries, control her aggression, and step outside her role as the victim. Mother's experience with the agency triggered memories of past abuse, as if "it's happening all over again," which caused Mother to go into "fight mode" and become verbally aggressive. Although Mother was receptive to learning how to address and appropriately respond to stressful situations, the counselor noted Mother was not always successful in implementing the tools she learned in therapy – especially as it pertained to her interactions with WCCS. The counselor testified that Mother's aggressive behavior got worse as the agency's case proceeded. Mother did not take responsibility for her own actions and words in dealing with the agency. Mother filed complaints and grievances against WCCS's workers and recorded her interactions with the agency on her phone, the latter of which the counselor found concerning. In Mother's current state of mental health, the counselor was not comfortable discharging Mother from treatment as Mother "still [had] some things to learn about how to regulate her emotions."

{¶ 28} The psychologist who completed Mother's September 2016 psychological evaluation testified Mother's past experiences have undermined her sense of trust and limited her ability to take advantage of the help that others try to give her. Although the psychologist acknowledged that diagnoses for a personality disorder, generalized anxiety disorder, major depressive disorder, and a substance abuse disorder do not preclude a person's ability to parent, he opined that "the experience [Mother] had growing up * * * left her poorly equipped to – to cope with the stress and pressures of everyday life, and that includes the pressures of parenting." Mother's inability to implement the emotional response regulation that she was learning in mental health counseling was concerning to the

psychologist. He believed Mother's inability to put these tools into practice would "pose the greatest challenge" to the stresses of child rearing.

{¶ 29} The in-home therapist from the Bair Foundation testified she began working with Jacob in October 2016 to help him find ways to manage his ADHD, which interfered with his ability to stay focused and complete tasks at home and at school. The therapist met with Jacob and his foster parents weekly in the foster parents' home and taught them tools for helping Jacob to stay on task, follow directions, and pay attention. The therapist testified Jacob's foster parents were consistent in employing the tools she taught them. The foster parents were able to redirect Jacob when he lost focus and they set appropriate boundaries for him.

{¶ 30} The therapist testified that she also began sessions with Jacob and Mother in November 2016. The visits did not occur in Mother's home, but rather at WCCS's visitation center and office. Only two sessions were held before Mother's visitations with Jacob were suspended. During those sessions, Jacob was easily distracted and Mother struggled to redirect him. Mother appeared to become frustrated with Jacob and the tone of voice she used when addressing him changed, which was not helpful in managing Jacob's ADHD. After Mother's visitations with Jacob were suspended, the Bair Foundation agreed to continue appointments with Mother. However, after Mother repeatedly cancelled and rescheduled the appointments, the Bair Foundation terminated its services.

{¶ 31} Mother testified at the hearing that she and Jacob share a strong bond, that until December 2016, they spoke to each other every day on the phone for up to five minutes, and that they enjoyed going to the park, visiting relatives, playing games, and reading books together. Mother denied the need to complete a bonding assessment, opining that the agency only added that requirement to her case plan in an attempt to keep Jacob

from her.

{¶ 32} Mother believes Jacob should be returned to her custody as she is capable of caring for him. She testified she is employed full-time at a factory and resides in a three-bedroom condominium that has plenty of room for her and Jacob. Mother explained that she has learned through her parenting courses and therapy sessions how important it is to remain consistent in her parenting and discipline. She also testified that she now knows how to "deal with difficult behaviors that might happen."

{¶ 33} Mother denied that she physically threatened anyone at WCCS. She stated that when she told the supervisor that she was "coming for [her]," she meant she was filing a complaint against the supervisor. Mother testified she has taken steps to prevent WCCS from making her a victim throughout the pendency of the case, including "filing civil complaints, civil lawsuits, going to the ACLU, [and] contacting the judicial commission."

{¶ 34} Mother admitted she referred to WCCS workers as "liars" and "manipulators" and once stated "this is why people shoot people" in reference to dealing with WCCS. She also admitted she made a threatening statement following a court hearing on January 12, 2017, as the CASA's attorney walked past her. The CASA's attorney was dressed in a purple dress and she overheard Mother state, "Go get your shotgun and blow her effing head off, the girl in the purple dress." Mother acknowledged she was "in the wrong" for making the statement, but indicated she was just "venting" on the phone to a friend.

{¶ 35} Mother vehemently denied that she was using marijuana. She claimed she had not smoked marijuana since September 2015, and that the results of the agency's drug tests were wrong. She stated she had a hair follicle test completed at her own expense in July 2016, and the results of that test came back negative for marijuana.

{¶ 36} Out of an abundance of caution, the juvenile court administered its own drug

test to Mother at the permanent custody hearing. This test came back positive for marijuana, and Mother indicated to the court that it was a false positive, likely caused by her consumption of Motrin.

{¶ 37} Jacob's maternal grandmother testified on behalf of Mother at the hearing. She indicated she had noticed a change in Mother's behavior since Mother began mental health counseling. She stated Mother is "steadier" and "doesn't fly off at silly things" like she had in the past.

{¶ 38} Maternal grandmother also testified she last observed Mother and Jacob together about six to eight months before the hearing, and they appeared to have a strong bond. She indicated Jacob was spoiled by Mother. She also stated that if Mother were to regain custody of Jacob, she was willing to provide support for Mother.

{¶ 39} Mother also called her former boss as a witness. He testified he was previously employed at the factory where Mother worked and, during the year he worked with Mother, he did not observe any erratic behavior or witness Mother "losing her cool" around anyone. He also testified that Mother had a "very good" work ethic.

{¶ 40} After hearing the foregoing testimony and considering the exhibits that were entered into evidence, including the evaluations and assessments completed on Mother, WCCS's case plans and amended case plans, progress notes and documents pertaining to Mother's mental health counseling and therapy sessions, certificates showing Mother's completed parenting classes and drug and alcohol treatment program, photographs of Mother and Jacob, and Mother's proposed care schedule for Jacob, the juvenile court granted WCCS's motion for permanent custody. In granting WCCS permanent custody, the court found by clear and convincing evidence that Jacob has been in the temporary custody of the agency for more than 12 months of a consecutive 22-month period, that Jacob could

not be placed in Mother's custody within a reasonable time period or should not be placed with her as she "failed continuously and repeatedly to substantially remedy the conditions causing the Child to be placed outside the Child's home," and that a grant of permanent custody to the agency was in Jacob's best interest.

{¶ 41} Mother appealed the juvenile court's decision, raising two assignments of error. As the assignments of error are related, we will address them together.

{¶ 42} Assignment of Error No. 1:

{¶ 43} THE TRIAL COURT'S AWARD OF CUSTODY OF THE MINOR CHILD TO THE STATE CONSTITUTED AN ABUSE OF DISCRETION.

{¶ 44} Assignment of Error No 2:

{¶ 45} THE TRIAL COURT'S FINDING THAT AWARDING PERMANENT CUSTODY OF THE MINOR CHILD TO THE STATE WAS IN THE BEST INTEREST OF THE MINOR CHILD WAS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED.

{¶ 46} In her first and second assignments of error, Mother challenges the juvenile court's decision to award WCCS permanent custody of Jacob. Mother argues the juvenile court erred when it determined it was in Jacob's best interest for permanent custody to be granted and further erred in "failing to return custody of the Minor Child to a parent who made significant, albeit imperfect, progress on her case plan."

{¶ 47} "The rights to conceive and to raise one's children have been deemed 'essential' * * *." *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208 (1972), quoting *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625 (1923). "Despite the fact that we have found that parents who are suitable have a paramount right to raise and care for their children, it is equally well settled that '[t]he fundamental interest of parents is not absolute.'" (Citations omitted.) *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 40. "The constitutional right to

raise one's children does not include a right to abuse, exploit, or neglect them, nor is there a right to permit others to do so." *Id.* "The state's power to terminate parental rights is circumscribed * * *." *Id.* at ¶ 41, citing *In re Cunningham*, 59 Ohio St.2d 100, 105 (1979). However, "when that authority is properly invoked, it is fully proper and constitutional to remove children from their parents' care. [S]uch an extreme disposition is nevertheless expressly sanctioned * * * when it is necessary for the 'welfare' of the child." *Id.*, quoting *Cunningham* at 105.

{¶ 48} The state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met before a natural parent's constitutionally protected liberty interest in the care and custody of his or her child may be terminated. *In re K.W.*, 12th Dist. Butler No. CA2015-06-124, 2015-Ohio-4315, ¶ 11, citing *Santosky v. Kramer*, 455 U.S. 745, 769, 102 S.Ct. 1388 (1982). Clear and convincing evidence is that which will produce in the trier of fact a firm belief or conviction as to the facts sought to be established. *Cross v. Ledford*, 161 Ohio St. 469, 477 (1954). An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination. *In re H.D.*, 12th Dist. Warren No. CA2016-11-098, 2017-Ohio-1333, ¶ 14. An appellate court will not reverse a finding by the juvenile court that the evidence was clear and convincing absent sufficient conflict in the evidence. *In re L.W.*, 12th Dist. Warren Nos. CA2017-05-066 thru CA2017-05-069, 2017-Ohio-8433, ¶ 29. "However, even if the juvenile court's decision is supported by sufficient evidence, 'an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence.'" *In re H.D.* at ¶ 14, quoting *In re T.P.*, 12th Dist. Butler No. CA2015-08-164, 2016-Ohio-72, ¶ 19.

{¶ 49} In determining whether a decision is against the manifest weight of the

evidence, an appellate court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. The presumption in weighing the evidence is in favor of the finder of fact, which we are especially mindful of in custody cases. *In re S.M.*, 12th Dist. Clermont No. CA2015-01-003, 2015-Ohio-2318, ¶ 10; *In re C.Y.*, 12th Dist. Butler Nos. CA2014-11-231 and CA2014-11-236 thru CA2014-11-238, 2015-Ohio-1343, ¶ 25. As a result, "[i]f the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." *Eastley* at ¶ 21.

{¶ 50} Pursuant to R.C. 2151.414(B)(1), a court may terminate parental rights and award permanent custody to a children services agency if it makes findings pursuant to a two-part test. *In re G.F.*, 12th Dist. Butler No. CA2013-12-248, 2014-Ohio-2580, ¶ 9. First, the court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors of R.C. 2151.414(D). *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 21. Second, the court must find that any of the following apply: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. R.C. 2151.414(B)(1)(a)-(e); *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033,

- 16 -

2015-Ohio-3709, ¶ 10. "Only one of those findings must be met for the second prong of the permanent custody test to be satisfied." *In re A.S.*, 12th Dist. Warren Nos. CA2015-12-112 and CA2015-12-113, 2016-Ohio-1580, ¶ 17.

{¶ 51} With respect to the second prong of the permanent custody test, Mother contends the juvenile court's finding that Jacob cannot be placed in her care within a reasonable time or should not be placed in her care was "subjectively inappropriate." However, she does not challenge the juvenile court's finding that Jacob has been in the temporary custody of the agency for more than 12 months of a consecutive 22-month period as of the date the agency filed the permanent custody motion. As set forth above, only one of the five factors set forth in R.C. 2151.414(B)(1)(a)-(e) must be met to support a grant of permanent custody. *See In re A.S.* at ¶ 17. As Mother does not dispute that clear and convincing evidence was presented demonstrating that Jacob has been in WCCS's custody for the requisite period of time to satisfy the statutory requirements of R.C. 2151.414(B)(1)(d), we need not address Mother's argument regarding the reasonable time standard. *See In re K.K.*, 12th Dist. Warren Nos. CA2017-05-071 thru CA2017-05-073, CA2017-06-084 thru CA2017-06-086, and CA2017-06-092 thru CA2017-06-094, 2017-Ohio 9098, ¶ 51.[3]

{¶ 52} Mother does challenge the juvenile court's determination that it is in Jacob's best interest for the agency to be granted permanent custody. R.C. 2151.414(D)(1) provides that in considering the best interest of a child in a permanent custody hearing, the court shall

---

3. Even if this court were to review Mother's argument, the evidence presented at the permanent custody hearing supports the juvenile court's finding that Jacob cannot be placed with Mother within a reasonable period of time. Clear and convincing evidence was presented to support the court's finding under R.C. 2151.414(E)(1) that Jacob cannot be placed with Mother within a reasonable time period and should not be placed with her because, notwithstanding reasonable case planning and diligent efforts by WCCS, Mother failed continuously and repeatedly to substantially remedy the conditions causing Jacob to be placed outside the home. Testimony from the supervisor, caseworker, psychologist and mental health counselor demonstrated that Mother's drug issues, mental health issues, and erratic and aggressive behaviors persisted despite the counseling and resources made available to her. After more than two years of the agency's involvement, Mother's unresolved drug dependency and mental health issues continue to pose a risk to Jacob's emotional well-being and physical safety.

consider all relevant factors, including, but not limited to the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 53} In awarding WCCS permanent custody, the juvenile court considered each of the best interest factors in light of the evidence presented at the hearing. With respect to R.C. 2151.414(D)(1)(a), the juvenile court found that Jacob is thriving in his foster home and has bonded to his foster parents and foster siblings. The court further noted that Jacob was in a foster-to-adopt home and that "[h]is only chance at stability is to be placed in the permanent custody of WCCS so that they can arrange for him to be adopted." As for Mother's bond with the child, although Mother contended she and Jacob shared a strong bond, there was evidence presented at the hearing indicating otherwise. The juvenile court heard testimony that agency employees observed a lack of bond between Mother and Jacob. The agency tried to remedy this by adding a bonding assessment to the case plan, but Mother felt the assessment was unnecessary and did not complete it.

{¶ 54} In its consideration of R.C. 2151.414(D)(1)(b), the juvenile court noted the CASA appointed to the case had recommended permanent custody be granted to the

agency.

{¶ 55} As for R.C. 2151.414(D)(1)(c), the juvenile court found that Jacob had been in WCCS's custody since the beginning of the case (February 17, 2015) and continued to be in its custody as of the date the court rendered its decision. Jacob, therefore, had been in the agency's custody for 12 or more months of a consecutive 22-month period.

{¶ 56} With respect to R.C. 2151.414(D)(1)(d), the court found that Jacob was in need of a legally secure placement and his need for such placement could not be obtained without the grant of permanent custody to the agency. In reaching this determination, the juvenile court found that Mother was not able to meet Jacob's needs and she failed to remedy the conditions that caused Jacob's removal. The court noted that in the two years Jacob had been removed from Mother's care, she made limited progress on her case plan. While she maintained employment and appropriate housing and completed parenting classes, Mother continued to test positive for marijuana "despite her attestations that the positive screens [were] a mistake and attributable to her use of Motrin, Protonix, or eating power bars from Walmart." Further, "Mother continue[d] to struggle with her mental health issues and her aggressiveness ha[d] escalated to the point that she ma[de] what is perceived to be threats to employees of WCCS and the attorney for CASA." The court also found that Mother failed to take responsibility for her situation and actions, despite being encouraged to do so by her mental health counselor, and continued to view herself as the victim and WCCS as her abuser. The court noted that Mother's "poor attendance in her mental health counseling sessions * * * ma[de] it difficult for the provider to make the progress necessary to give Mother the proper tools to parent her Child." The court ultimately concluded that Mother was unable to be reunified with Jacob within a reasonable time, that adoption was Jacob's best chance for achieving the stable home he needs and deserves, and that adoption was only

possible through a grant of permanent custody to the agency.

{¶ 57} With respect to R.C. 2151.414(D)(1)(e), the court found there were no factors in division (E)(7) through (11) of the statute that applied.

{¶ 58} After thoroughly reviewing the record, we find that sufficient credible evidence supported the juvenile court's determination regarding the best interest of the child. Although Mother loved Jacob and regularly visited and contacted him when permitted, Mother failed to make sufficient progress in dealing with her drug dependency, mental health, and behavioral issues. The testimony presented at the hearing indicated Mother's behavior became more aggressive and threatening as time went on. The psychologist believed Mother was "poorly equipped to * * * cope with the stress and pressures of everyday life, and that includes the pressures of parenting." Mother was unable to implement the tools she was learning in her mental health sessions when dealing with stressful situations, and her inability to implement these tools "pose[d] the greatest challenge" to her ability to parent Jacob.

{¶ 59} Mother refused to take responsibility for her own actions, viewing herself as the victim in her dealings with WCCS. Rather than working with WCCS towards the goal of reunification, Mother viewed WCCS as the "enemy" and verbally attacked the agency's employees. Despite admitting to her mental health counselor that she had at one point self-medicated with marijuana, Mother refused to accept responsibility for the numerous drug tests for which she tested positive. Mother claimed WCCS workers "lied" and "manipulated" the results of the tests or that the results were "false-positives" caused by her use of medication or eating energy bars. Even after the juvenile court administered its own drug test at the permanent custody hearing and Mother tested positive for marijuana, she continued to maintain she had not used the drug and that the results were a false-positive caused by her use of Motrin.

{¶ 60} Contrary to Mother's assertions, WCCS made reasonable efforts to reunify Mother with Jacob and, despite this, the conditions that existed at the beginning of the case that necessitated the agency's involvement persisted at the time the agency moved for permanent custody. At the time the agency gained temporary custody of Jacob, Mother had an open case plan with the agency involving Jacob's older half-brother, R.M. Part of Mother's case plan for both R.M. and Jacob required Mother to make certain behavioral changes. Mother needed to refrain from behaviors of physical and verbal abuse, improve her communication abilities, and learn to resolve conflicts before they escalated to the point that police involvement was necessary. Despite months of mental health counseling, Mother's behavior remained erratic and threatening. Mother threatened harm to a WCCS supervisor and to the CASA's attorney. She repeatedly called the agency, up to 25 times per day, and threatened to take Jacob from the agency when the agency ended her unsupervised visitation. As neither Mother's behavior nor her communication abilities had progressed, the court's finding that Mother "failed to remedy the conditions resulting in the Child's removal" is supported by the record.

{¶ 61} Accordingly, in light of the foregoing, we conclude that the juvenile court's findings are supported by sufficient credible evidence and are otherwise not against the manifest weight of the evidence. The juvenile court did not err in finding it was in Jacob's best interest to be placed in the permanent custody of WCCS. Mother's first and second assignments of error are, therefore, overruled.

{¶ 62} Judgment affirmed.

PIPER and M. POWELL, JJ., concur.

- 21 -