[Cite as *In re K.K.*, 2017-Ohio-9098.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

|  |  |  |  |
|---|---|---|---|
| IN THE MATTER OF: | : | CASE NOS. | CA2017-05-071 |
|  |  |  | CA2017-05-072 |
| K.K., et al. | : |  | CA2017-05-073 |
|  |  |  | CA2017-06-084 |
|  | : |  | CA2017-06-085 |
|  |  |  | CA2017-06-086 |
|  | : |  | CA2017-06-092 |
|  |  |  | CA2017-06-093 |
|  | : |  | CA2017-06-094 |
|  |  |  |  |
|  | : | O P I N I O N |  |
|  |  | 12/18/2017 |  |
|  | : |  |  |

APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case Nos. 15-D000113, 15-D000114, and 15-D000115

David P. Fornshell, Warren County Prosecuting Attorney, Kathryn M. Horvath, 520 Justice Drive, Lebanon, Ohio 45036, for appellee, Warren County Children Services

Mary K. Martin, 4660 Duke Drive, Suite 101, Mason, Ohio 45040, for appellant, Staniela King

Lauren L. Clouse, 7681 Tylers Place Blvd., Suite 3, West Chester, Ohio 45069, for appellant, Glen Keene

Tyrone P. Borger, 24 Remick Blvd., Springboro, Ohio 45066, for appellant, Jacqueline King

John C. Kaspar, 130 East Mulberry Street, Lebanon, Ohio 45036, for appellant, Randall King

**PIPER, J.**

{¶ 1} Appellants Jacqueline King, Randall King, Staniela King, and Glen Keene,

appeal the decisions of the Warren County Court of Common Pleas, Juvenile Division granting permanent custody of K.K., M.K., and S.M., to appellee, Warren County Children Services ("WCCS" or "the agency").

{¶ 2} Staniela is the children's biological mother. Glen is the biological father of M.K. and S.M. The biological father of K.K. was not identified.

{¶ 3} Staniela and Glen resided in Kentucky. A Kentucky children services agency removed the children from Staniela's and Glen's care several times because of housing instability and drug abuse. In 2011, after the Kentucky agency removed the children for the third time, it placed the children in the temporary custody of Randall, their maternal grandfather, and his wife Jacqueline.[1] Jacqueline and Randall lived with the children in Warren County.

{¶ 4} Staniela and Glen later relinquished legal custody of the children to Randall and Jacqueline. In 2013, Randall and Jacqueline adopted K.K. Randall and Jacqueline continued to maintain legal custody of M.K. and S.M.

{¶ 5} On October 23, 2015, WCCS filed a complaint alleging that the children were dependent. The complaint alleged that S.M., age eight, had been hospitalized because of violent behavior toward K.K., age five, and M.K., age six, including threatening to harm them with knives. Jacqueline and Randall reported to the agency that they did not think they could care for S.M. or protect the younger children from S.M. The agency also alleged that Randall exposed the children to pornography and was physically and verbally abusing the children. The agency initiated a safety plan whereby Randall left the home. However, Jacqueline later informed the agency that Randall was needed in the home for support. WCCS alleged that it was concerned with Randall's and Jacqueline's mental health and their capacity to protect

---

1. Randall is Staniela's father. Jacqueline is not biologically related to Staniela or the children.

- 2 -

the children. The complaint requested that the court grant the agency temporary custody of the children.

{¶ 6} The court conducted an emergency shelter care hearing on the same day and made findings necessary to place the children in the agency's temporary custody. The agency placed S.M. in a residential treatment center at a hospital in Youngstown and placed K.K. and M.K. with a foster family. In December 2015, the juvenile court adjudicated the children dependent. On January 20, 2016, the court continued temporary custody with the agency.

{¶ 7} WCCS developed case plans for the appellants, with the goal of returning the children to Jacqueline and Randall or reunifying the children with their biological parents. The case plan required appellants to complete various services related to their issues with mental health, drug and alcohol abuse, and parenting. The plan required random drug screens. The case plan allowed weekly supervised visits with the children.

{¶ 8} Jacqueline and Randall exercised weekly visits with K.K. and M.K. However, Randall would excessively tickle and poke the children. Visitation monitors repeatedly warned Randall that this behavior was inappropriate and asked him to stop. Nonetheless, he continued the behavior. Visitation monitors observed Jacqueline displaying favoritism towards K.K. in M.K.'s presence. Jacqueline and Randall did not exercise visits with S.M.

{¶ 9} In early May 2016, M.K. disclosed to her foster parent that Randall had been sexually abusing her since she was three years old. The agency suspended visits with Jacqueline and Randall. M.K. participated in a forensic interview and described the abuse. Following the interview, the agency considered M.K.'s allegations substantiated. A criminal investigation ensued.

{¶ 10} Jacqueline and Randall would not cooperate with the investigation. Randall

moved out of state and began living with his sister. Randall no longer participated in his case plan objectives and no longer communicated with the agency.

{¶ 11} In November 2016, a Warren County grand jury indicted Randall for two counts of rape and one count of gross sexual imposition, with M.K. as the alleged victim. Randall returned to Warren County after the indictment and was incarcerated until he posted bond. He then returned to his home with Jacqueline in Warren County.

{¶ 12} Jacqueline complied with her case plan requirements, including completing mental health and drug and alcohol assessments. However, the agency was concerned because Jacqueline told its workers that she did not believe that Randall abused M.K., that M.K. lied about the abuse, and that Staniela and Staniela's mother coached M.K. into lying.

{¶ 13} While Jacqueline's visits with K.K. and M.K. were suspended, Jacqueline gave the agency numerous letters and cards to pass on to the children. Agency workers refused to pass on approximately 80 percent of the correspondences because of inappropriate content, including suggestions that M.K. was lying and implications that the children would be reunified with her soon.

{¶ 14} During the pendency of the case, Staniela lived approximately four hours away from Warren County, in northern Indiana and later in southern Michigan. Staniela rarely visited her children. Staniela completed some case plan services through a local service provider in Indiana. However, she repeatedly tested positive for THC in random drug screens.

{¶ 15} Glen also lived in northern Indiana while the case was pending. Glen visited with S.M. on several occasions, but not regularly. Glen had two or three visits with M.K. Glen did not complete his case services related to drug counseling.

{¶ 16} On February 21, 2017, WCCS moved for permanent custody. In May 2017,

the juvenile court held a hearing on the motion. Only Jacqueline appeared to defend her parental rights. Staniela's attorney moved for a continuance, explaining that his client told him she would be at the hearing but had not called the attorney's office to say she would be late for the hearing. The court denied Staniela's motion. Randall's attorney next asked the court for a continuance, explaining that Randall could not be "involved" in the permanent custody case because of the pending criminal indictments and that Randall could jeopardize his ability to defend the criminal charges if he testified. The court denied Randall's motion.

{¶ 17} The state elicited testimony from the forensic interviewer who spoke with M.K. concerning the alleged sexual abuse. M.K. was seven years old at the time of the interview. The interviewer opined that based on her experience in interviewing child abuse victims, M.K.'s allegations were substantiated.

{¶ 18} S.M.'s therapist testified that she began treating S.M. in July 2016, when he was nine years old. Medical professionals diagnosed S.M. with several mental health conditions, including post-traumatic stress disorder. S.M. never spoke of Jacqueline or Randall, except to discuss Randall's physical and verbal abuse. S.M. was more bonded with Staniela and Glen, but was traumatized because he witnessed them using drugs.

{¶ 19} S.M.'s therapist further testified that Glen visited S.M. approximately once a month. These visits made S.M. very happy. S.M. wanted to live with Glen. However, sometimes Glen would cancel a visit or show up to a visit significantly late and this was very upsetting to S.M. Staniela never visited S.M. Initially, Staniela would call S.M. but she later stopped calling.

{¶ 20} A therapist testified that K.K. and Jacqueline had a bond. K.K. missed Jacqueline. The therapist testified that M.K., however, feared both Jacqueline and Randall and did not want to see either of them. M.K. had a few visits with Glen and was very excited

to see her biological father. The therapist testified that K.K. and M.K. shared a strong bond and it would be very detrimental to separate the two girls.

{¶ 21} Jacqueline testified that prior to removal S.M. had been acting out sexually in the home. Jacqueline claimed that M.K. was "putting him up to it." However, Jacqueline stated that Randall had been watching R-rated programming on the television and the children may have seen it.

{¶ 22} An agency caseworker testified. With respect to Jacqueline, the agency was concerned that Jacqueline did not believe M.K.'s sexual abuse allegations. Moreover, they were concerned with her ability to protect the children as she had allowed Randall back in the home. However, Jacqueline completed all of her case plan services.

{¶ 23} With regard to Staniela, she did not complete her case plan services, failed to have a home study approved, and could not remain drug free. Staniela last had a verifiable visit with M.K. in February 2016. Staniela may have exercised a visit with M.K. in or around Easter of 2016, but the agency had no corroborating documentation. The agency suspended Staniela's visits with M.K. and S.M. in September 2016 because of failed drug tests and she never visited with her children again.

{¶ 24} With respect to Glen, he did not complete all case plan services because he could not afford to attend drug counseling classes. He exercised only a few visits with M.K. from May 2016 through the date of the permanent custody hearing. The caseworker confirmed that both M.K. and S.M. wished to live with Glen.

{¶ 25} With respect to M.K. and K.K.'s foster family, the agency caseworker testified that the foster family was willing to adopt and that the two girls called their foster mother "mommy."

{¶ 26} Jacqueline testified that Randall was living with her at the time of the

- 6 -

permanent custody hearing. Jacqueline confirmed that she did not believe M.K.'s sexual abuse allegations. Nonetheless, Jacqueline stated that she would do whatever was necessary to regain custody of the children, including divorcing Randall.

{¶ 27} The GAL did not testify at the permanent custody hearing but earlier filed a written report. The GAL interviewed the children. S.M. wished to live with Glen, and if not Glen, Jacqueline and Randall. K.K. and M.K. were "thriving" in their foster home, and the GAL had no concerns about the foster home. M.K. wished to continue to live in the foster home and did not want to be separated from the foster family. K.K. wanted to continue living with her foster family but had an equivalent desire to live with Jacqueline and Randall. Both girls told the GAL that their most important desire for permanency was to remain with one another.

{¶ 28} Despite numerous attempts to communicate, the GAL only spoke to Glen at court dates and had no contact with him since June 2016. Similarly, Staniela would not communicate with the GAL in the year preceding the permanent custody hearing.

{¶ 29} Ultimately, the GAL recommended that the court grant permanent custody of the children to the agency. The GAL cited the lack of verifiable progress towards reunification by the children's biological parents, and that the children could not be protected if placed with Jacqueline and Randall.

{¶ 30} The court issued a decision granting permanent custody to the agency. The court found that the children had been in the agency's temporary custody for 12 or more months of a consecutive 22-month period, that the children could not be placed with appellants within a reasonable time or should not be placed with them and that a grant of permanent custody to the agency was in the children's best interest.

{¶ 31} Appellants have individually raised five assignments of error in this

consolidated appeal. Jacqueline and Glen's assignments of error raise similar arguments, and we will address those arguments together.

{¶ 32} Jacqueline's assignment of error:

{¶ 33} THE JUVENILE COURT'S DECISION TO GRANT PERMANENT CUSTODY TO WARREN COUNTY [CHILDREN] SERVICES WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND FAILED TO MEET THE CLEAR AND CONVINCING STANDARD.

{¶ 34} Jacqueline argues that the greater weight of the evidence established that returning the children to her, rather than granting WCCS permanent custody, was in the children's best interest. In this regard, Jacqueline argues that the record established that she fully completed the agency's case plan requirements and services.

{¶ 35} Jacqueline also argues that the manifest weight of the evidence did not support the conclusion that the children could not be placed with her within a reasonable time or should not be placed with her. In this respect, Jacqueline again argues that she completed all case plan services and requirements. Additionally, Jacqueline stated she would divorce her husband, if necessary, to obtain custody of the children.

{¶ 36} Glen's assignment of error:

{¶ 37} THE TRIAL COURT ERRED IN FINDING, BY CLEAR AND CONVINCING EVIDENCE, THAT THE BEST INTEREST OF THE CHILDREN, PURSUANT TO THE FACTORS SET FORTH IN R.C. 2151.414(D), WAS REACHED BY GRANTING PERMANENT CUSTDOY TO WARREN COUNTY CHILDREN SERVICES.

{¶ 38} Glen argues that the best interest factors set forth in R.C. 2151.414(D) weighed in his favor rather than in favor of permanent custody to the agency. Glen argues that M.K. and S.M. were happy to see him when he visited, and that he had visited with them before their removal. Moreover, both M.K. and S.M. wished to be placed with him. Finally,

- 8 -

the only portion of Glen's case plan he did not complete was the drug classes, which were too expensive. Glen also argues that he never tested positive for drugs during the pendency of the case.

**{¶ 39}** "The rights to conceive and to raise one's children have been deemed 'essential' * * *." *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208 (1972), quoting *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625 (1923). "Despite the fact that we have found that parents who are suitable have a paramount right to raise and care for their children, it is equally well settled that '[t]he fundamental interest of parents is not absolute.'" (Citations omitted.) *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 40. "The constitutional right to raise one's children does not include a right to abuse, exploit, or neglect them, nor is there a right to permit others to do so." *Id.* "The state's power to terminate parental rights is circumscribed * * *." *Id.* at ¶ 41, citing *In re Cunningham*, 59 Ohio St.2d 100, 105 (1979). However, "when that authority is properly invoked, it is fully proper and constitutional to remove children from their parents' care. [S]uch an extreme disposition is nevertheless expressly sanctioned * * * when it is necessary for the 'welfare' of the child." *In re K.H.* at ¶ 41, quoting *Cunningham* at 105.

**{¶ 40}** The state must prove by clear and convincing evidence that the statutory standards for permanent custody have been met before a natural parent's right to custody can be terminated. *Santosky v. Kramer*, 455 U.S. 745, 769, 102 S.Ct. 1388 (1982); *In re E.G.*, 12th Dist. Butler No. CA2013-12-224, 2014-Ohio-2007, ¶ 6. "Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 477 (1954). This court's review of a juvenile court's decision granting permanent custody is limited to whether sufficient credible evidence exists to support the

juvenile court's determination. *In re M.B.*, 12th Dist. Butler Nos. CA2014-06-130 and CA2014-06-131, 2014-Ohio-5009, ¶ 6. An appellate court will not reverse a finding by the juvenile court that the evidence was clear and convincing absent sufficient conflict in the evidence. *Id.*

{¶ 41} A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. When considering a manifest weight of the evidence challenge, the reviewing court weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts, the trial court clearly "lost its way" and created such a "manifest miscarriage of justice" that the judgment must be reversed and a new trial ordered. *State v. Cummings*, 12th Dist. Butler No. CA2006-09-224, ¶ 12.

{¶ 42} "Pursuant to R.C. 2151.414(B)(1), a court may terminate parental rights and award permanent custody to a children services agency if it makes findings pursuant to a two-part test." *In re T.P.*, 12th Dist. Clermont No. CA2016-03-012, 2016-Ohio-5780, ¶ 13. First, the court must find that the grant of permanent custody to the agency is in the best interest of the child. R.C. 2151.414(B)(1). In so doing, the court shall consider all relevant factors, including, but not limited to, the factors enumerated in R.C. 2151.414(D). Second, the court must find that any of the following apply: (1) the child is abandoned, (2) the child is orphaned, (3) the child has been in temporary custody of the agency for at least 12 months of a consecutive 22-month period, (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child

on three separate occasions. R.C. 2151.414(B)(1)(a) thru (e); *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709, ¶ 10. To satisfy part two of the permanent custody test, only one of the above five findings need be met. *Id.*

{¶ 43} R.C. 2151.414(D)(1) provides that in considering the best interest of a child in a permanent custody hearing:

> [T]he court shall consider all relevant factors, including, but not limited to, the following:
>
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 44} In granting WCCS' motion for permanent custody, the juvenile court considered each of the best interest factors in light of the evidence presented at the hearing. With respect to the first statutory factor, the juvenile court found that S.M. had progressed in therapy to the point where he could be placed in a foster home setting. The juvenile court found that M.K. and K.K. were bonded with their foster family and that they were strongly bonded with one another and that separating the two children was not viable. The juvenile court concluded that the children's only chance for stability was to be placed with WCCS so

- 11 -

that WCCS could arrange for adoption.

{¶ 45} In consideration of the second statutory factor, the juvenile court relied on the GAL's report. S.M. told the GAL that he wanted to live with Glen because "he would never hurt him" and they always had fun together. The court noted, however, that Glen failed to take advantage of his case plan services in order to prepare him for reunification. The GAL reported that M.K. and K.K. were "thriving" in foster care and that M.K. wished to remain living with K.K. at the foster family home. The GAL recommended a grant of permanent custody to WCCS because of a lack of verifiable case plan progress by Staniela and Glen, because Randall is a danger to the children, and because the children could not be sufficiently protected by Jacqueline.

{¶ 46} With respect to the third statutory factor, the juvenile court reviewed the children's custodial history and found the children had been in the temporary custody of WCCS since their removal on October 23, 2015, and continued to be in WCCS' custody at the time of its decision.

{¶ 47} In considering the fourth statutory factor, the juvenile court found the children's need for a legally secure placement could only be achieved by granting permanent custody to WCCS. Specifically, the juvenile court found that appellants were not able to meet the children's needs and failed to remedy the conditions that caused the children's removal. Jacqueline still resided in the same home as Randall. And appellants were unable to demonstrate that they could be reunified with the children in a reasonable time. The juvenile court noted that adoption was the best chance for the children to achieve the stable family home that they need and deserve, and that adoption was only possible through a grant of permanent custody to the agency.

{¶ 48} With respect to the fifth statutory factor, the juvenile court found that no factors

- 12 -

applied.

**{¶ 49}** After thoroughly reviewing the record, we find that sufficient credible evidence supported the juvenile court's determination regarding the best interest of the children. Glen exercised some visits with the children but visited less as the case progressed. Glen's inconsistency with his visits, or his failure to appear timely for visits was detrimental to S.M. Nonetheless, S.M. and M.K. both were bonded with their father and both children wished to live with him. However, Glen had an extensive history of drug abuse, which caused the removal of his children, and had previously given up legal custody of the children. Although Glen may have resolved his drug abuse issues, he made no significant efforts towards achieving reunification although the case had been ongoing for nearly two years. Glen also failed to communicate with the children's GAL. Finally, Glen's failure to take meaningful steps towards achieving reunification is exemplified by his failure to attend the permanent custody hearing and defend his parental rights.

**{¶ 50}** Jacqueline complied with the agency's case plan for reunification. However, Jacqueline's behavior throughout the pendency of the case has confirmed that she is incapable of providing a safe environment for the children. Jacqueline apparently blames M.K. for much of the dysfunction in the family. She claimed that M.K. caused S.M. to act out sexually. She further claimed that M.K. fabricated her sexual abuse allegations after being coached by Staniela and Staniela's biological mother. Although she claims that M.K. is lying, Jacqueline stated that she would nonetheless divorce Randall to regain custody.

**{¶ 51}** We need not address Jacqueline's argument that sufficient credible evidence did not support the juvenile court's decision that the children could not be placed with her in a reasonable time or should not be placed with her. Jacqueline has not challenged the juvenile court's decision that the children were in the temporary custody of the agency for more than

12 months of a consecutive 22-month period. As discussed above, the court need only find that one of the five factors applies to support a grant of permanent custody. *In re C.B.*, 2015-Ohio-3709, ¶ 10. Accordingly, this court overrules Jacqueline's and Glen's assignments of error.

{¶ 52} Staniela's Assignment of Error No. 1:

{¶ 53} THE TRIAL COURT ERRED IN GRANTING THE STATE'S MOTION FOR PERMANENT CUSTODY.

{¶ 54} In her first assignment of error, Staniela contends that sufficient credible evidence did not support the court's decision that the agency made reasonable efforts to reunite her with the children. Staniela contends that the WCCS caseworkers testified that they did not make a referral for services for Staniela or offer her help. WCCS argues that it was not statutorily required to prove reasonable efforts to reunite, as set forth in R.C. 2151.419(A), in a permanent custody hearing.

{¶ 55} Generally, a juvenile court does not have to make a reasonable efforts determination pursuant to R.C. 2151.419(A)(1) in a permanent custody hearing. *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 41. R.C. 2151.419 provides that, but for a few narrowly defined statutory exceptions, the juvenile court must find a children services agency made "reasonable efforts" to reunify a family at hearings involving the adjudication, emergency custody, detention, and disposition for abused, neglected, or dependent children. *C.F.* at ¶ 43. The children services agency has the burden of proving that it made those reasonable efforts. R.C. 2151.419(A)(1). However, if the agency has not established that reasonable efforts have been made prior to the permanent custody hearing, then it must demonstrate such efforts at that time. *Id.*

{¶ 56} The juvenile court made the reasonable effort findings mandated by R.C.

2151.419 when it granted emergency custody to the agency and at other hearings throughout the pendency of the case, including the dispositional hearing. Moreover, the record reflects that the agency made reasonable efforts given Staniela's level of participation in the case.

{¶ 57} The agency did not make referrals for service because Staniela told agency workers that she would seek services locally. However, the agency had trouble verifying that Staniela completed those services, which they eventually learned she did not. There is no evidence in the record suggesting that Staniela reached out to the agency for assistance and was ignored. The record otherwise demonstrates Staniela's lack of commitment to reuniting with her children. Staniela rarely visited her children during the pendency of the case and then failed to appear for the permanent custody hearing. This court overrules Staniela's first assignment of error.

{¶ 58} Staniela's Assignment of Error No. 2:

{¶ 59} THE TRIAL COURT ERRED IN DENYING APPELLANT'S TRIAL COUNSEL'S REQUEST FOR CONTINUANCE.

{¶ 60} In her second assignment of error, Staniela argues that court abused its discretion in denying her request for a continuance after she failed to appear for the permanent custody hearing. Staniela contends that the record does not indicate that the court engaged in any consideration of her need for a continuance.

{¶ 61} The decision whether to grant or deny a motion for a continuance is left to the trial court's sound discretion. *State v. Unger*, 67 Ohio St.2d 65, 67 (1981). An abuse of discretion suggests the "trial court's decision was unreasonable, arbitrary or unconscionable." *State v. Perkins*, 12th Dist. Clinton No. CA2005-01-002, 2005-Ohio-6557, ¶ 8. "A review under the abuse-of-discretion standard is a deferential review." *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, ¶ 14. In making its determination, the trial court should consider

the length of the delay requested, the inconvenience to other litigants, witnesses, opposing counsel, and the trial court, whether the requested delay is for a legitimate reason or dilatory and contrived, whether the requesting party contributed to the circumstances giving rise to the request, and any other factor relevant to the facts and circumstances of the case. *Unger* at 67-68. Additionally, pursuant to Juv.R. 23, "[c]ontinuances shall be granted only when imperative to secure fair treatment for the parties."

{¶ 62} We find no abuse of discretion in the court's decision not to continue the permanent custody hearing when Staniela failed to appear and communicate with her attorney concerning her appearance. In addition, given Staniela's failure to participate in the case, a continuance was unnecessary to secure fair treatment for the parties. Accordingly, this court overrules Staniela's second assignment of error.

{¶ 63} Randall's assignment of error:

{¶ 64} THE TRIAL COURT ERRED BY DENYING RANDALL KING'S MOTION TO CONTINUE, DENYING BASIC PROCEDURAL FORMALITIES REQUIRED TO ENSURE DUE PROCESS.

{¶ 65} Randall argues that the court abused its discretion by failing to continue the permanent custody hearing because he was under indictment for alleged sex crimes against M.K. and he could not testify without fear of jeopardizing his upcoming criminal trial. In other words, Randall argued that the court's failure to continue the hearing until after the criminal trial was effectively a denial of his Fifth Amendment right to remain silent.

{¶ 66} However, Randall did not appear for the hearing, which belies his claim that the court's failure to continue the hearing prejudiced him by causing him to expose himself to self-incrimination. Moreover, Randall's counsel did not indicate the length of continuance requested. However, the record reflects that Randall had a trial date scheduled in August.

- 16 -

{¶ 67} R.C. 2151.414(A)(2) requires a juvenile court to hold a hearing on a public children services agency's motion for permanent custody not later than 120 days after the agency files a motion for permanent custody. The juvenile court may, "for good cause shown", continue the hearing for a reasonable period beyond the 120-day deadline. *Id.* However, R.C. 2151.4014(A)(2) further provides the juvenile court "shall issue an order that grants, denies, or otherwise disposes of the motion for permanent custody, and journalize the order, not later than two hundred days after the agency files the motion." *Id.*

{¶ 68} WCCS moved for permanent custody on February 21, 2017 and the hearing occurred on May 7, 2017, or approximately 41 days before the expiration of the statutory limit. Therefore, the juvenile court had a limited time frame to continue the hearing within the 120-day period without a showing of good cause. A continuance until Randall completed his criminal trial would have extended the hearing date beyond the 120-day period and likely beyond the 200-day statutory requirement for the juvenile court to journalize its ruling on WCCS' motion for permanent custody. A delay would have been contrary to the overarching goal of juvenile custody laws, i.e., to achieve permanency in children's lives. See *In re B.T.H.*, 12th Dist. Butler No. CA2017-06-080, 2017-Ohio-8358, ¶ 30. Therefore, a continuance was not imperative to secure fair treatment of the parties and the juvenile court did not abuse its discretion by denying Randall's request. Therefore, this court overrules Randall's assignment of error.

{¶ 69} Judgment affirmed.

HENDRICKSON, P.J., and S. POWELL, J., concur.

- 17 -