[Cite as *In re Z.B.*, 2024-Ohio-5387.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


| | | |
|---|---|---|
| IN RE: | : | |
| Z.B., ET AL. | : | CASE NOS. CA2024-06-075 |
| | | CA2024-06-076 |
| | : | CA2024-06-077 |
| | : | O P I N I O N |
| | | 11/14/2024 |
| | : | |
| | : | |


APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case Nos. JN2021-0264; JN2021-0265


Garrett Law Offices, and Dawn S. Garrett, for appellant, father.

Anne Harvey, for appellant, mother.

Michael T. Gmoser, Butler County Prosecuting Attorney, and Michael Greer, Assistant Prosecuting Attorney, for appellee.

Sarah A. Owens, guardian ad litem.

Jeannine C. Barbeau,  guardian ad litem.


**BYRNE, J.**

{¶ 1}     Appellants Melissa Barnard and Joseph Dinkins ("Mother" and "Father"),

the parents of minor children Z.B. and S.B. ("Zelda" and "Sara"), appeal the decision of the Butler County Court of Common Pleas, Juvenile Division, granting permanent custody of the children to the Butler County Department of Jobs and Family Services ("the Agency").[1]  For the reasons outlined below, we affirm the juvenile court's decision.

## I. Overview

{¶ 2}     In August 2021, police received a call that a child, Sara, was wandering in the street unsupervised.  After taking Sara to her home, police observed what they believed were deficient housing conditions and reported the situation to the Agency.  During the Agency's subsequent investigation, Mother acknowledged she allowed homeless individuals in the home, allowed drug use to occur there, and had used methamphetamine.  In early October 2021, Mother tested positive for methamphetamine and was incarcerated for 30 days.  At that time and during the ensuing proceedings, Father was in Florida serving time for several felony convictions.  He later lived in a halfway home, the Orlando Rescue Mission, Project Hope, receiving substance abuse and mental health services.

{¶ 3}     The conditions at Mother's home eventually prompted the Agency to file a complaint on October 4, 2021 alleging Zelda and Sarah were dependent.  The Agency also filed a complaint regarding Zane, Mother's eldest child.[2]  Zane's custody is not in dispute on appeal.  All three children were placed in the temporary custody of the Agency on October 4, 2021 and found to be dependent children on November 10, 2021.

{¶ 4}     The Agency moved for permanent custody of Zelda and Sara on February

---

1. "Zelda" and "Sara" are a pseudonyms adopted for this opinion for the purposes of privacy and readability. *In re D.P.*, 2022-Ohio-4553, ¶ 1, fn. 1 (12th Dist.).

2. "Zane" is another pseudonym adopted by the court.

15, 2023. A permanent custody hearing was held on January 5, 2024. On January 29, 2024, the magistrate granted the Agency's motion for permanent custody. Objections were filed by Mother and Father, but the trial court overruled those objections and adopted the magistrate's decision on May 16, 2024.

{¶ 5} Further facts, including evidence and testimony presented at the permanent custody hearing, will be discussed below.

## II. Legal Analysis

{¶ 6} Mother raised two assignments of error. Father raises similar assignments of error, but also several more.

### A. Weight and Sufficiency of the Evidence

{¶ 7} Mother's first assignment of error states:

THE TRIAL COURT'S FINDING THAT PERMANENT CUSTODY TO THE AGENCY IS IN THE BEST INTEREST OF THE CHILDREN IS NOT SUPPORTED BY SUFFICIENT CLEAR AND CONVINCING EVIDENCE AND IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 8} Mother's second assignment of error states:

THE TRIAL COURT'S FINDING THAT THE AGENCY PROVIDED REASONABLE CASE PLANNING AND DILIGENT EFFORTS IS NOT SUPPORTED BY SUFFICIENT CLEAR AND CONVINCING EVIDENCE AND IS AGAINST THE MANIFEST WIGHT OF THE EVIDENCE.

{¶ 9} Father's first assignment of error states:

THE TRIAL COURT'S DECISION TO GRANT THE AGENCY PERMANENT CUSTODY OF THE CHILDREN IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND NOT SUPPORTED BY SUFFICIENT EVIDENCE.

{¶ 10} Both Mother and Father make various arguments on appeal as to why the magistrate and trial court's findings are not supported by sufficient evidence or are

otherwise against the manifest weight of the evidence. Some of these arguments touch upon concepts relevant to the two prongs of R.C. 2151.414(B)(1)'s permanent custody test, and we will address their arguments within that framework where they appear relevant.

**1. Factual and Procedural Background**

{¶ 11} After the children were placed in the Agency's temporary custody in October of 2021, a case plan for Mother was developed and approved by the trial court with the goal of reuniting the children with her. The plan required that she, among other things, complete all substance abuse and mental illness recommendations as well as an in-home parenting program. Mother completed a substance abuse program, and by the time of the permanent custody hearing she was sober and no substance abuse concerns existed. Mother also participated in mental health services. Mother was unsuccessfully discharged from her parenting education program after failing to participate. Mother told the Agency she wanted to begin parenting educational services only after she had stable employment and housing.

{¶ 12} However, Mother's employment and housing were in constant flux. Mother claims she is illiterate which made it difficult for her to get and keep a job. Mother was referred to Opportunities for Ohioans with Disabilities which assists struggling individuals seek long term employment, but her participation in that program was limited because Mother refused "to just work for food stamps." Meanwhile, the Agency struggled to verify Mother's address as she moved repeatedly, living variously during the proceedings at the house of a boyfriend, with another friend, at a hotel, with family members, at various homeless shelters, and at the YWCA shelter. Mother eventually obtained a one-bedroom apartment, but the Agency never viewed the interior of the apartment. The

Agency also had concerns that because it was a one-bedroom apartment, it was insufficient to house the children. At the permanent custody hearing, Mother was asked how long it would take for her to "have a home and a job and be able to support" the children, and Mother answered that she would need "like six (6) or seven (7) years, [to] make sure that [she had] enough time."

{¶ 13} Mother visited Zelda and Sarah during the proceedings. However, these visits remained at a higher level of supervision. In addition, Mother's relationship with the children was described by a visitation supervisor as "a friend relationship more so than a parenting relationship." Zelda and Sara's GAL stated in her report to the magistrate that Zelda grew frustrated with Mother's engagement during visits and sometimes desired not to continue them.

{¶ 14} As mentioned above, Father was incarcerated in Florida in 2020 after receiving several felony convictions. Thus, Father had no in-person visitation with the children during the underlying proceedings. However, Father did send gifts to the children and began video visits with them in July of 2023. Those visits went well. At the permanent custody hearing, Zelda's therapist testified that Zelda "would like to have longer meetings with her father . . . [and that] she wishes that she could see him in person." At the same time, Zelda's therapist did not believe Zelda and Father were bonded. Outside of the video visits with Father, Sara had little to no recollection of him. At the time of the permanent custody hearing, Father was still in Florida living at a halfway home. Father was then participating in substance abuse and mental health services.

{¶ 15} Zelda and Sarah were placed together in a foster home. Zane was not placed with Zelda and Sarah; Zelda had previously alleged that Zane inappropriately touched her. Zelda and Sarah generally had a good experience at the foster home, but

it was not deemed a potential adoptive home due, at least in part, to behavioral concerns regarding Zelda. Zelda, now 14 years old, is on an individualized education program and at the time of the permanent custody hearing had the cognition of a child half her age. Zelda was also diagnosed with several behavioral disorders, including ADHD and PTSD. The trial court noted, "Due to some sexualized behaviors, there is concern that she may have experienced sexual abuse in the past."

{¶ 16} According to the GAL, while Zelda possessed a "childlike" understanding of the proceedings, she stated multiple times she desires to be adopted. Sara's desires were less clear to the GAL due to Sara's inability to focus or communicate clearly. However, Sara told the GAL that she liked living with Zelda. The magistrate conducted an in-camera review with Zelda to assess her wishes.

{¶ 17} At the permanent custody hearing, Father testified that Evalee Bowman, a former teacher and family friend of Father, was willing to care for Zelda and Sara. Father further testified that he had spoken with Bowman the day before the permanent custody hearing. However, Father was unsure of whether Bowman lived in Tennessee or Texas. Father claimed he had previously notified the Agency about Bowman but that the Agency refused to investigate placement of the children with her. Outside of Father's testimony, there is no mention of Bowman in the record.

{¶ 18} As stated above, the magistrate granted the Agency's motion for permanent custody. The magistrate found that it was in the children's best interest to grant the motion. In addition, the magistrate noted that the children had been in the Agency's custody for approximately 27 months and that the children could not and should not be placed with either Mother or Father in a reasonable time.

## 2. Applicable Law and Standards of Review

**{¶ 19}** "Before a natural parent's constitutionally protected liberty interest in the care and custody of [her] child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met." *In re M.G.*, 2023-Ohio-1316, ¶ 44 (12th Dist.); R.C. 2151.414(E). Under R.C. 2151.414(B)(1), the juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re K.P.*, 2022-Ohio-1347, ¶ 17 (12th Dist.). First, R.C. 2151.414(B)(1) provides that the juvenile court must find that the grant of permanent custody to the agency is in the "best interest" of the child. *In re M.H.*, 2022-Ohio-48, ¶ 35 (12th Dist.). Second, the juvenile court must find that one of the circumstances set forth in R.C. 2151.414(B)(1)(a) to (e) apply. *In re R.B.*, 2022-Ohio-1705, ¶ 31 (12th Dist.). Those circumstances include: (1) the child is abandoned, R.C. 2151.414(B)(1)(b); (2) the child is orphaned, R.C. 2151.414(B)(1)(c); (3) the child has been in the temporary custody of one or more public children services agencies for 12 or more months of a consecutive 22-month period, R.C. 2151.414(B)(1)(d); (4) the child has been removed from the parents' custody or been adjudicated as abused, neglected, or dependent on three separate occasions, R.C. 2151.414(B)(1)(e); and (5) the circumstances described in R.C. 2151.414(B)(1)(b), (c), (d), and (e) do not apply, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the parents, R.C. 2151.414(B)(1)(a). *In re J.B.*, 2023-Ohio-2454, ¶ 13. Only one of these circumstances need apply to satisfy the second prong of the two-part permanent custody test. *In re C.S.*, 2020-Ohio-4414, ¶ 16 (12th Dist.).

**{¶ 20}** "An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence

exists to support the juvenile court's determination." *In re A.S.*, 2019-Ohio-4127, ¶ 19 (12th Dist.). However, "[e]ven if there is sufficient evidence to support the juvenile court's decision, an appellate court may nevertheless reverse a permanent custody judgment if it finds the judgment to be against the manifest weight of the evidence." *In re G.A.*, 2023-Ohio-643, ¶ 18 (12th Dist.), citing *In re F.S.*, 2021-Ohio-345, ¶ 61 (12th Dist.). In determining whether a juvenile court's judgment is against the manifest weight of the evidence, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re S.M.*, 2019-Ohio-198, ¶ 16 (12th Dist.), quoting *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. The presumption in weighing the evidence favors the finder of fact, which we are especially mindful of in custody cases. *In re R.K.*, 2021-Ohio-3074, ¶ 15 (12th Dist.). Therefore, if the evidence is susceptible to more than one construction, the reviewing court is bound to give it the interpretation that is consistent with the verdict and judgment. *In re D.S.*, 2022-Ohio-998, ¶ 63 (12th Dist.).

### 3. First Part of the Permanent Custody Test: Best Interest Analysis

{¶ 21} R.C. 2151.414(D)(1) provides that in considering the best interest of a child in a permanent custody hearing, a juvenile court must consider all relevant factors, including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for

the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

A juvenile court may also consider any other factors it deems relevant to the child's best interest. *In re A.J.*, 2019-Ohio-593, ¶ 24 (12th Dist.).

**{¶ 22}** Based upon its consideration of the R.C. 2151.414 factors, the juvenile court found by clear and convincing evidence that it was in the best interest of Zelda and Sara to grant permanent custody to the Agency. Upon review, we agree.

**{¶ 23}** As to the first best interest factor—that is, the interaction and interrelationship of the child with her parents, foster caregivers, and others, R.C. 2151.414(D)(1)(a)—the evidence demonstrated that while Mother regularly visited with Zelda and Sara, she had to remain under supervision while doing so, and their relationship ultimately represented more that of a friendship than a parent-child relationship. Zelda also expressed frustration to her GAL that Mother was on occasion not engaged during visits, to the point Zelda sometimes did not want to visit with Mother. As to Father, while their visits went well, they were all conducted by video and did not start until July of 2023 as a result of Father's incarceration and living in Florida. Further, Zelda's therapist reported Zelda and Father were not bonded, and the GAL reported that Sara had little to no memory of Father before video visits began in July of 2023.

**{¶ 24}** Meanwhile, no serious issues were reported or raised on appeal concerning Zelda and Sara's current foster placement. Though this placement may not result in adoption, the Agency does not have "to prove that adoption is likely" to make permanent custody in the best interest of the children. *In re C.W.*, 2020-Ohio-1248, ¶ 76 (10th Dist.). Ultimately, this first factor, while perhaps close, favors an award of permanent custody to the Agency.

**{¶ 25}** As to the second best interest factor—the wishes of the child, R.C. 2151.414(D)(1)(b)—the GAL opined in her report that permanent custody of Zelda and Sara should be granted to the Agency.[3] Despite Zelda's developmental delays, the GAL indicated that Zelda understood, at least in a limited capacity, the gravity of the proceedings and stated a desire to be adopted (indicating she did not want to remain in Mother's or Father's custody). The magistrate met with Zelda during an in-camera interview, and nothing in the record indicates the magistrate learned anything contradictory to the GAL's observations and recommendations. Sara did not and could not express an opinion on the proceedings due to her inability to focus or communicate clearly, but did indicate a desire to remain wherever Zelda was. This second best interest factor also favors an award of permanent custody to the Agency.

**{¶ 26}** Regarding the third best interest factor—the custodial history of the child, R.C. 2151.414(D)(1)(c)—both Zelda and Sara have been in the Agency's temporary custody since October of 2021. Therefore, this third best interest factor favors an award of permanent custody to the Agency.

**{¶ 27}** As to the fourth best interest factor—the children's need for a legally secure

---

3. Father's concerns regarding the GAL will be discussed further below.

permanent placement, R.C. 2151.414(D)(1)(d)—the record demonstrates that neither Mother nor Father can provide Zelda and Sara with such a placement. While Mother completed substance abuse and mental health treatment and has a recent record of sobriety, she has never sought to reenter a parenting education program after being discharged, has not kept gainful employment, and has been unable to obtain housing suitable to shelter her children. In addition, Mother's statement that she needed between two and six years to stabilize both her employment and housing situations before she would be able to support Zelda and Sara demonstrates (1) an inability to recognize the urgency of these proceedings and her children's need for a secure and permanent home, and (2) her inability to provide such a home.

{¶ 28} Father is, unfortunately, currently in an even worse position to provide for the children. He has had limited interaction with the children (and no in-person contact) because of his incarceration and participation in assistance programs out of state. At the very least, Father's location, lack of employment, and lack of housing make him unable to provide a legally secure and permanent placement for the children.

{¶ 29} For these reasons, the fourth best interest factor favors an award of permanent custody to the Agency.

{¶ 30} As a result of the foregoing, we conclude the juvenile court did not err in finding the best interest factors weighed in favor of awarding permanent custody to the Agency. There is sufficient credible evidence to support the juvenile court's determination that awarding permanent custody to the Agency was in Zelda and Sara's best interest, and the juvenile court's determination is not against the manifest weight of the evidence.

**4. Second Part of the Permanent Custody Test**

{¶ 31} As mentioned above, the juvenile court found that two of the circumstances

under the second prong of the permanent custody test were met in this case. Specifically, the court found that (1) the children had been in the Agency's custody for over two years (referencing the "12 of 22" circumstance described in R.C. 2151.414[B][1][d]), and (2) the children could not or should not be placed with either Mother or Father in a reasonable time (referencing the "reasonable time" circumstance described in R.C. 2151.414[B][1][a]).

**{¶ 32}** On appeal, Mother and Father do not challenge the juvenile court's finding under R.C. 2151.414(B)(1)(d) that Zelda and Sara had been in the temporary custody of the Agency for at least 12 months of a consecutive 22-month period ("12 of 22" finding). Because they do not challenge the "12 of 22" finding, we need not review that finding. However, we note that the record unquestionably establishes that the "12 of 22" finding was met in this case because Zelda and Sara were placed in the temporary custody of the agency in October 2021, were adjudicated dependent in November 2021, and remained in the Agency's custody through the date the Agency filed for permanent custody, in February 2023.

**{¶ 33}** Mother and Father both directly or indirectly challenge the juvenile court's R.C. 2151.414(B)(1)(a) finding under the second prong of the permanent custody test— that the children could not or should not be placed with either Mother or Father in a reasonable time ("reasonable time" finding). But because Mother and Father do not challenge the "12 of 22" finding, we need not review their arguments with regard to the R.C. 2151.414(B)(1)(a) "reasonable time" finding. *In re J.N.L.H.*, 2022-Ohio-3865, ¶ 26 (12th Dist.). However, we note that this finding, by its clear language, only applies when the circumstances described in R.C. 2151.414(B)(1)(b), (c), (d), and (e) do *not* apply. R.C. 2151.414(B)(1)(a).

### 5. "Reasonable Efforts" by the Agency

{¶ 34}    Both Mother and Father argue the Agency did not make "reasonable efforts" to unify them with the children.  However, they approach these arguments in different ways, so we will examine their arguments separately.

{¶ 35}    Mother states that the Agency's "efforts for reunification were inadequate," and she challenges the juvenile court's "finding that the Agency provided reasonable case planning and diligent efforts to assist the parents."  In support of this argument, she cites R.C. 2151.414(E)(1) and specifically argues that having to work with several caseworkers during the proceedings limited her progress.  She further believes the Agency should have made referrals to assist her with her illiteracy.

{¶ 36}    Mother bases her "reasonable efforts" argument on R.C. 2151.414(E)(1), but that statute merely provides the criteria for analyzing whether "a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents," which is one of the R.C. 2151.414(B)(1) circumstances under the second prong of the permanent custody test.  As stated above, because the juvenile court's finding that the R.C. 2151.414(B)(1)(d) circumstance ("12 of 22") applied was not challenged, there is no need to analyze the juvenile court's finding under R.C. 2151.414(B)(1)(a).  Mother's argument with regard to "reasonable efforts" is moot.  *In re C.P.*, 2022-Ohio-3320, ¶ 27 (12th Dist.).

{¶ 37}    Father, in turn, makes a different "reasonable efforts" argument.  Father takes issue with the Agency not putting him on a case plan until late in the proceedings and not referring him to any programs.  Father also argues the Agency did not investigate Bowman as a potential non-relative kinship placement for Zelda and Sara.  However, Father's "reasonable efforts" argument, to the extent it relates to R.C. 2151.414(B)(1)(a)

- 13 -

and (E)(1) is, like Mother's "reasonable efforts" argument, moot because he does not challenge the juvenile court's "12 of 22" finding on appeal. *In re C.P.* at ¶ 27.

{¶ 38} Father also argues in passing that the Agency did not make reasonable efforts under R.C. 2151.419 and 5153.16(A)(19), but neither statute is relevant to our permanent custody analysis on appeal. "Generally, a juvenile court does not have to make a reasonable efforts determination pursuant to R.C. 2151.419(A)(1) in a permanent custody hearing." *In re K.K.*, 2017-Ohio-9098, ¶ 55 (12th Dist.), citing *In re C.F.*, 2007-Ohio-1104, ¶ 41. "By its terms, R.C. 2151.419 applies only at hearing held pursuant to R.C. 2151.28, 2151.31(E), 2151.33 or 2151.353." *In re C.F.* at ¶ 41. "These sections involve adjudicatory, emergency, detention, and temporary-disposition hearings, and dispositional hearings for abused, neglected or dependent children, all of which occur prior to a decision transferring permanent custody to the state" and are not at issue in this appeal. *Id.* Finally, R.C. 5153.16(A)(19)—the other statute Father references in discussing "reasonable efforts"—merely refers to a public children services agency's general duty to "[m]ake reasonable efforts to prevent the removal of an alleged or adjudicated abused, neglected, or dependent child from the child's home, or make it possible for the child to return home safely . . .," and is not part of a juvenile court's statutorily-required permanent custody analysis. The statute does not state any standards by which to assess whether the Agency fulfilled that duty in the permanent custody context. In summary, Father's "reasonable effort" argument is not relevant to our permanent custody analysis on appeal.

{¶ 39} Nonetheless, we will make a few observations. This court has long held that "'[r]easonable efforts' does not mean all available efforts. Otherwise, there would always be an argument that one more additional service, no matter how remote, may

have made reunification possible." *In re K.M.*, 2004-Ohio-4152, ¶ 23 (12th Dist.); *see also In re S.H.*, 2020-Ohio-3499, ¶ 13 (12th Dist.), quoting *In re K.M.*

**{¶ 40}** As part of her case plan, Mother was referred to substance abuse, mental health, parenting, and employment programs. While Mother completed her substance abuse program and remains sober to this day—an accomplishment to be commended—her participation in the other programs was less demonstrably successful. Despite referrals for other services, Mother believed she needed between two and six years to stabilize her employment and housing situation. Ultimately, the record reflects the Agency made reasonable efforts, despite potential personnel issues, to assist and attempt to get Mother in a position to take back custody of the children. What the record also makes clear is that even if additional services were made available to her, Mother was incapable or unwilling to take prompt advantage of them to take back custody of Zelda and Sara.

**{¶ 41}** As to Father, his incarceration in Florida and his decision to remain in Florida "made it difficult, if not impossible, for [the Agency] to provide meaningful services" to Father. *In re S.D.*, 2009-Ohio-1047, ¶ 14 (10th Dist.). Further, it is unclear what services and referrals he believes the Agency could have made for him that he was not already receiving from the halfway home he resided at, including substance abuse and mental health programs.

**{¶ 42}** Finally, we are unconvinced the Agency "failed" to investigate whether Bowman represented a suitable, interim placement for Sara and Zelda. Father claims he informed the Agency about Bowman a mere two months before the permanent custody hearing, but Father can point to nothing in the record besides his own testimony to support this or his allegation that the Agency knew of but did not investigate placement of the

- 15 -

children with her. Father was not even sure where Bowman lived despite their purportedly close relationship and willingness to send his children to reside with her. Ultimately, the record does not speak enough on this issue for us, let alone the trial court, to find any fault by the Agency.

**{¶ 43}** Considering the foregoing, we conclude that the magistrate's decision was supported by sufficient evidence and not against the manifest weight of the evidence. Mother's first and second assignments of error and Father's first assignment of error are overruled.

### B. Separate Counsel

**{¶ 44}** Father's second assignment of error states:

> THE TRIAL COURT ERRED AND VIOLATED [ZELDA'S] CONSTITUTIONAL DUE PROCESS RIGHT TO BE REPRESENTED BY COUNSEL WHEN IT PROCEEDED WITH A PERMANENT CUSTODY TRIAL WITHOUT APPOINTING SEPARATE COUNSEL APART FROM THE GUARDIAN AD LITEM.

**{¶ 45}** Father argues on appeal that the trial court should have appointed separate counsel for the children because the GAL's recommendation was at odds with Zelda's stated desires. Mother raised the same concern within her first assignment of error.

### 1. Factual and Procedural Background

**{¶ 46}** When asked at the permanent custody hearing whether Zelda had "expressed any desire to have more of a relationship with [Father] or to spend more time with him" Zelda's therapist responded "she would like to have longer meetings with her father . . . she wishes that she could see him in person." After this testimony, Father's attorney asserted Zelda's GAL had a conflict of interest because the GAL had

recommended the Agency be granted permanent custody. The GAL addressed Father's concerns on the record, stating:

> [T]he only testimony that [Father's counsel] is referring to is in relation to the oldest child, [Zelda]. It was not explored in that testimony how frequently or consistently she had expressed that. She has not expressed that desire to her legal counsel and did not provide any context to that. . . [F]or sake of thoroughness, I addressed this again with the children and [Zelda] very clearly does not want to be returned to either parent, does not want to visit and said that neither parent deserves to visit with [her]. . . I don't know how we could be more clear about her wishes at this point.

The magistrate later conducted an in-camera interview with Zelda.[4]

### 2. Applicable Law and Standard of Review

{¶ 47} We have previously observed that when an attorney is appointed as a GAL, "that attorney may also act as counsel for the child, absent a conflict of interest." *In re L.W.*, 2017-Ohio-8433, ¶ 17 (12th Dist.). A conflict of interest can exist, meriting appointment of separate counsel, where the GAL's "recommendations regarding their best interest[s] conflict with the children's wishes." *In re J.M.*, 2009-Ohio-4824, ¶ 52 (12th Dist.). Conflicts of interest are determined on a case-by-case basis, and courts often consider whether the child "possess the necessary maturity to provide a credible indication regarding their wishes as to custody" as well as whether the child "consistently and repeatedly expressed a strong desire that differs and is otherwise inconsistent with the guardian ad litem's recommendations." *In re L.W.* at ¶ 17; *In re A.M.*, 2023-Ohio-1523, ¶ 14 (12th Dist.). This issue is reviewed de novo on appeal. *In re Hilyard*, 2006-Ohio-1965, ¶ 35 (4th Dist.); *In re M.A.P.*, 2023-Ohio-1755, ¶ 115 (15h Dist.); *see also In*

---

4. We echo the GAL's brief which notes "Father's brief confusingly argues that no in camera was provided to determine Z.B.'s wishes. However, Father's counsel herself requested an in camera [sic] and one in fact was conducted on January 8, 2024. Notably the Court did not appoint independent counsel after that in camera interview."

*re B.K.*, 2011-Ohio-4470, ¶ 18-20 (12th Dist.).

### 3. Analysis

**{¶ 48}** We are entirely unconvinced the GAL had a conflict of interest. As noted by the GAL at the trial level, this argument is based solely on testimony from Zelda's therapist that Zelda once stated a desire to "spend more time" with Father. Regardless of Zelda's cognitive ability or maturity issues discussed above, this single comment does not amount to a "consistent" or "strong" indication that Zelda's desires differed from her GAL's recommendation that the Agency be granted permanent custody.

**{¶ 49}** Father's second assignment of error is overruled.

### C. The Indian Child Welfare Act

**{¶ 50}** Father's third assignment of error states:

> DID THE TRIAL COURT COMMIT PLAIN ERROR WHEN IT FAILED TO INQUIRE DURING THE PERMANENT CUSTODY TRIAL IF THE CHILDREN WERE ELIGIBLE FOR MEMBERSHIP IN A FEDERALLY RECOGNIZED INDIAN TRIBE?

**{¶ 51}** Father argues the trial court's decision should be reversed because it did not comply with the Indian Child Welfare Act (the "Act"), 25 U.S.C. 1911. In support, Father notes that early in the case, Mother informed the trial court on multiple occasions that she and her family were of Cherokee and Blackfoot heritage. Despite this, Father argues the trial court made no inquiry of any party or counsel during the permanent custody trial as to whether the Act applied to the case.

### 1. Factual and Procedural Background

**{¶ 52}** On November 10, 2021, a pretrial took place, and the magistrate asked Mother and Father whether they were aware or had reason to know that the children were eligible for membership in an Indian tribe. The following exchange then took place:

Mother: Well, I know my family is Indian, has Indian Tribe in them but I don't know which Indian Tribe we are. I have two (2) different separate Indian Tribes in me. I don't know the head leaders or nothing like that. I'm just putting that out there. I do know that I do have Blackfoot and Cherokee Indian in me.

Magistrate: Okay, but you don't know which tribes?

Mother: I just know Blackfoot and Indian, I don't know the name of the tribes or the tribal leader or anything. I don't know none of that. I just know that I have Blackfoot and Cherokee in me.

Magistrate: Alright, I don't know that that's going to narrow anything down enough but maybe you could explore that a little bit further, [and] provide the caseworker with more information . . . [I]f the children are members of or eligible for membership in a federally recognized Indian tribe, the Agency does need to notify the tribe so that the tribe can make a determination whether or not they want [to] intervene in the case . . .

Wife: Okay.

Magistrate: [Father], do you have any information about that issue?

Father: No ma'am.

Magistrate: Okay. Alright . . . [Y]ou folks are instructed to advise the Court if you subsequently receive information that would provide you reason to know that the children . . . would be considered Indian children, okay?

Mother: Okay, if I find anything out, I'll let you know but I doubt I will because I have not ever claimed (INAUDIBLE) tribe because I don't know tribes. I just know I have that in me.

{¶ 53} Mother was again asked about the children's Indian heritage at a review hearing on May 3, 2022. There, the magistrate asked if Mother had any additional information regarding whether the children were eligible for membership in an Indian tribe. Mother responded:

No, I don' t know anybody . . . My mom and dad both have died and that's the only people that really know.  On my dad's side, is my father[.]  I met my step-brother but we don't really talk . . . [I]t' s on my dad's side but no, not as far as I know. And I can ask my brothers but we have never been in the tribe. We don't know the tribe (INAUDIBLE).  And we have not really (INAUDIBLE) for that, ever.

. . .

But I don't think, I don't, so we have never, me and my brothers have never (INAUDIBLE).  To the reservation or anything like that or anybody that's related to that.  We just know that we got Indian blood in us.

**{¶ 54}**   At this hearing, the magistrate again told Mother to inform the Agency if she learned any information regarding the children's eligibility for membership in an Indian tribe.  The transcript of the proceedings reveals no other references to the children's Indian heritage or eligibility for membership in a tribe.

## 2. Applicable Law and Standard of Review

**{¶ 55}**   Put simply, the Act is a federal law that creates various procedural requirements which "aim[ ] to keep Indian children connected to Indian families." *Haaland v. Brackeen*, 599 U.S. 255, 255 (2023).  Failure by Ohio courts "to identify Indian children can nullify court proceedings that have not been conducted in accordance with [the Act]."  Ohio Adm.Code 5101:2-53-02.

**{¶ 56}**   Among other things, the Act requires state courts to inquire of "each participant in an emergency or voluntary or involuntary child-custody proceeding" whether there is any reason to believe a children involved is an "Indian child."  25 C.F.R. 23.107(a).  "Indian child" is defined by the Act as a minor who "(1) Is a member or citizen of an Indian Tribe; or (2) Is eligible for membership or citizenship in an Indian Tribe *and* is the biological child of a member/citizen of an Indian Tribe."  (emphasis added) 25

C.F.R. 23.2. Evidence that a child merely has Indian heritage is insufficient to invoke the Act. *See id.*; *In re J.B.*, 2018-Ohio-1201, ¶ 19 (8th Dist.); *B.1 Determining whether the child is an "Indian child" under ICWA*, 2016 WL 8737952; *see also* U.S. Dept. of Interior, *Guidelines for Implementing the Indian Child Welfare Act*, https://www.bia.gov/sites/default/files/dup/assets/bia/ois/pdf/idc2-056831.pdf (Accessed Nov. 12, 2024).

{¶ 57}    Father did not raise any issue regarding the Act at the trial level, meaning he has forfeited all but plain error. *In re A.R.B.*, 2024-Ohio-4830, ¶ 16 (12th Dist.); *Doran v. Doran*, 2009-Ohio-5521, ¶ 15 (12th Dist.). A party asserting plain error must show an obvious error by the trial court that affects that party's "substantial rights." *State v. Rogers*, 2015-Ohio-2459, ¶ 22. Stated differently, plain errors "'must have affected the outcome of the trial.'" *Id.*, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002); *see also State v. Biros,* 78 Ohio St.3d 426 (1997) ("Plain error does not exist unless it can be said that but for the error, the outcome of the trial would clearly have been otherwise.").

{¶ 58}    The plain error doctrine should only be applied in civil appeals, which includes permanent custody cases, "in *the extremely rare* case involving *exceptional* circumstances where [the] error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." (Emphasis added.) *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121-123 (1997); *In re J.M.*, 2019-Ohio-3716, ¶ 14 (12th Dist.). This "very high standard" reinforces the idea that parties in civil cases "bear responsibility for framing the issues and for putting both the trial court and their opponents on notice of the issues they deem appropriate for . . . resolution." *Perez v. Falls Financial, Inc.*, 87 Ohio St.3d 371, 375 (2000), *id.* at 122. As a result, "the

plain error doctrine should never be applied to reverse a civil judgment simply because a reviewing court disagrees with the result obtained in the trial court, or to allow litigation of issues which could easily have been raised and determined in the initial trial." *Goldfuss* at 122.

### 3. Analysis

**{¶ 59}** Upon review, based on the record before the trial court, there was no reason to believe the children are members of an Indian tribe or eligible for tribal membership. In fact, Mother's testimony makes it certain the children are not. Mother testified the children have Indian ancestry, but this alone is insufficient to invoke the Act because the Act requires the children to be either a member of an Indian tribe or be eligible for membership *and* the child of a member of a tribe. Mother expressly testified she was not a member of any tribe. Further, when he was asked if he knew anything on the issue of the children's eligibility for membership in a tribe, Father replied he did not.

**{¶ 60}** Even assuming for the sake of argument the magistrate and trial court failed to follow the procedural requirements of the Act to the letter, Father was clearly on notice of the question of whether the children were potential members of a tribe. He could have notified the court of any alleged deficiencies pertaining to the Act that prejudiced him, via objections to the magistrate's decision. He did not do so. We therefore conclude no plain error occurred.

**{¶ 61}** Father's third assignment of error is overruled.

### D. Cumulative Error

**{¶ 62}** Father's fourth assignment of error states:

> FOURTH ASSIGNMENT OF ERROR: THE TRIAL COURT'S CUMULATIVE ERROR VIOLATED THE PARENTS' AND [ZELDA'S] CONSTITUTIONAL RIGHT TO DUE PROCESS EVEN

IF THE INDIVIDUAL ERROR[S] DO NOT CONSTITUTE CAUSE FOR REVERSAL.

**{¶ 63}** Finally, Father argues the trial court's cumulative errors alleged above merit reversal. Under the cumulative error doctrine, an appellate court will reverse a conviction if the collective effect of trial errors prevented a defendant from having a fair trial, even if each error individually did not. *State v. Akladyous*, 2023-Ohio-3105, ¶ 60 (12th Dist.), citing *State v. Kirkland*, 2014-Ohio-1966, ¶ 140. As stated above, we have found no error in this case and therefore need not consider the cumulative error doctrine.

**{¶ 64}** Father's fourth assignment of error is overruled.

### III. Conclusion

**{¶ 65}** The juvenile court properly concluded it was in Zelda and Sara's best interest to grant permanent custody to the Agency. The juvenile court's decision was supported by clear and convincing evidence and was not against the manifest weight of the evidence. Each of Mother and Father's assignments of error are overruled.

**{¶ 66}** Judgment affirmed.

S. POWELL, P.J., and M. POWELL, J., concur.